UNITED STATES, Appellee

v.

Todd A. DOCK, Private First Class
U.S. Army, Appellant.

No. 68,504.
CMR No. 446898.

U.S. Court of Military Appeals.

Argued Nov. 3, 1993.

Decided Aug. 19, 1994.

Appellant: *David M. Lewis, Jr.* (argued); *Captain Beth G. Pacella* (on brief); *Captain Teresa L. Norris.*

Appellee: *Major Joseph C. Swetnam* (argued); *Colonel Dayton M. Cramer, Major James L. Pohl, Captain Robert J. Walters* (on brief).

*Opinion of the Court*

COX, Judge:

Before this Court, appellant stands convicted of premeditated murder and robbery, in violation of Articles 118 and 122, Uniform Code of Military Justice, 10 USC §§ 918 and 922, respectively.[1] We granted review of issues relating to admissibility of his pretrial confessions and the propriety of certain questions posed by the military judge to expert witnesses.[2] *Finding no error, we affirm.*

Appellant was originally tried and convicted in 1984. That court-martial sentenced appellant to death. The Court of Military Review set aside the findings and sentence on several grounds; a rehearing was authorized. 26 MJ 620 (1988), *aff'd,* 28 MJ 117 (CMA 1989).

Appellant was retried in 1989. Again the charges were referred capital; and again appellant was convicted. The second court-martial panel, however, did not adjudge the death penalty. *See* n. 1.

1. His approved sentence extends to a dishonorable discharge, confinement for life, total forfeitures, and reduction to the lowest enlisted grade.

2. We also granted review of an issue that has since been decided against appellant by the Supreme Court of the United States in *Weiss v. United States,* —— U.S. ——, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994).

3. As the Court of Military Review noted:
   The record reflects that the term "RAD" is slang for "comrade" and is commonly used by

I

As is normal in such cases, the record of trial is lengthy. The general chronology and circumstances of the offense were concisely outlined by the Court of Military Review:

There is overwhelming, undisputed evidence proving that on the morning of 12 June 1984, the appellant, Private First Class (PFC) Todd A. Dock entered the taxicab of Claus Engelhardt and stabbed him to death as he robbed him on a highway near Giessen, Germany.

The appellant spent the evening of 11–12 June 1984 in his barracks on Ayers Caserne watching videotapes and sharing a pizza and three bottles of wine with his roommate, Specialist (SPC) Korpash. At about 0200 hours, the appellant, who had become somewhat intoxicated, brandished a six-inch long knife and began slicing the pages of a comic book. He announced that he was going to "get a RAD" to avenge the death of his father.[3] He also told Korpash he wanted to rob a taxi driver because he needed money and asked him to accompany him in the venture. In describing how he intended to commit the crime, the appellant said that he would hold the knife to the driver's throat while he was driving and make him pull over before relieving him of his money. When Korpash expressed skepticism about the chances for success of the plan, the appellant said he would cut the driver's throat if he failed to comply with his instructions. When Korpash declined to participate in the venture, the appellant menaced him with the knife and warned him not to inform anyone of his intentions. The appellant then hid the knife on his person,

American military personnel when referring to Germans. There is nothing in the record to explain appellant's attribution of his father's death to a German.
35 MJ at 630 n. 2. Indeed, appellant's mother testified that she and her husband had adopted appellant when he was 2–3 months old and, after findings, that while appellant was still in high school, Mr. Dock had suddenly "dropped dead" at the age of 52, apparently in Frederick, Maryland.

stated he was going to get some gloves, and went to the guard house near the main gate of the Caserne where the appellant sometimes served as a gate guard. While there, he obtained a pair of white gloves from a desk which he claimed belonged to him. One of the guards, Sergeant Rivas, testified that the appellant said he wanted to become a member of his shift, that he displayed a knife to him, that he smelled of alcohol, and that he appeared rational and in control of his faculties. The appellant then got up, said that he had to "take care of some business," and left the guard house.

At about 0300 hours, the appellant departed the Caserne and entered Claus Engelhardt's taxi which was waiting at a taxi stand near the main gate. He initially directed Engelhardt to drive to a service club in Kirchgoens but then directed him to drive to a club in Giessen. On the way, the appellant held the knife to Engelhardt's neck and ordered him to stop the taxi. Engelhardt refused to do so and began fighting with the appellant. During the ensuing struggle, the appellant attempted to stab Engelhardt, causing him to lose control of the taxi. The taxi swerved from the highway, first hitting the right guardrail, then ricocheted across the road hitting the center guardrail before stopping. The appellant then overpowered Engelhardt and stabbed him in the neck until he lost consciousness. As he dragged the wounded Engelhardt from the taxi, the latter grabbed the appellant's arm. The appellant repeatedly stabbed him in the abdomen and chest, again rendering him unconsciousness [sic]. The appellant then searched the taxi, eventually finding and taking Engelhardt's wallet containing his money, driver's licenses, and personal documents.

Unable to start the vehicle, the appellant began running down the highway in the opposite direction from Giessen. He sequentially threw the bloodspattered knife, its sheath, the gloves, and Engelhardt's empty wallet down an adjoining embankment into the bushes and woods. As he abortively attempted to hitchhike to Ayers Caserne, he was observed by a passing German police car. Either at the appellant's request or without his objection, two German policemen gave him a ride, seating him in the rear of the vehicle. Initially, the police did not suspect the appellant of committing any offense, having given him the ride so he would not have to walk upon the highway. However, after receiving and investigating a radio report about Engelhardt's seemingly abandoned taxi, discovering Engelhardt's corpse, and observing the appellant's bloodstained hands and clothes, they apprehended the appellant for the killing. Their suspicions were triggered when they noticed that the appellant appeared to become nervous when they reversed direction and approached the crime scene; and when he attempted to climb out of the police car stating that he wanted to walk back to Ayers Caserne, a distance of ten kilometers.

The appellant was taken to a German police station where he was photographed, and his clothes and samples of his hair, fingernails, and bodily fluids were taken for analysis. A blood-alcohol test determined that the appellant's blood, taken at about 0450 hours, contained 1.65 milligrams of alcohol per milliliter of blood. This would have indicated a blood-alcohol level of about 2.00 at the time the killing occurred. Despite his intoxication, the appellant was able to speak clearly and walk normally. He was able to undress himself without losing his balance even though he was handcuffed. During questioning by the German police, the appellant denied killing Engelhardt with a knife. At one point, he spontaneously exclaimed, "Boom, Boom, I killed him." At another point, he requested an American lawyer and asked if he could get one from the United States. The interrogator was of the opinion that at times the appellant appeared to fake being asleep and being intoxicated.

Later that morning, the appellant made a detailed confession to Special Agent Bowen, an Army criminal investigator. Initially, the appellant stated that "he had taken a taxi to Giessen while intoxicated, and two black guys had gotten into the

taxi, and they were the ones that had committed the offense." However, after being confronted with contradictory information, he confessed to robbing and killing Engelhardt. The following day, he made *another statement to Agent Bowen in* which he reaffirmed and clarified his earlier confession.

Engelhardt's driver's licenses, personal documents, and money were subsequently discovered under a mat beneath the front passenger seat of the German police car in which the appellant had been riding. The police also found the appellant's knife, sheath, and gloves, and Engelhardt's wallet near the highway where the appellant said he had thrown them. An autopsy attributed Engelhardt's death to massive loss of blood from multiple stab wounds. Blood and fibers on the appellant's clothing matched Engelhardt's blood and fibers from his sweater.

35 MJ 627, 629–31 (1992).

## II

■ At his rehearing, appellant moved *in limine* to suppress his two pretrial statements made to American investigators. He contended then, as he does now, that the statements were inadmissible and taken in violation of *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981).

Parenthetically, it would appear that these statements were quite superfluous to his conviction. His prior announcement of his intention to commit the crime (coupled with a description of his intended *modus operandi* ), his pre-crime display of the weapon (subsequently recovered near the crime scene and identified by his roommate), his being found near the crime scene shortly after the murder (covered with the victim's blood and fiber samples), and his attempt to secrete his plunder in the police vehicle, would seem for all practical purposes to moot the confession-admissibility question.

To underscore the point, appellant defended at the rehearing solely on a claim of lack of mental responsibility, his defense counsel signaling in closing argument:

Colonel Michitsch, members of the panel, when all is said and done, in this case, in effect, you have one issue; and that is, whether or not on 12 June 1984, as a result of a mental disease or defect, PFC Dock was substantially impaired, his ability to conform his conduct to the requirements of law, or appreciate the criminality of his acts.[4] . . .

Moreover, by the time the defense finished questioning *its own experts on direct examination,* nothing was left of the pretrial confessions that was not fully conceded at trial.

In any event, we disagree that *Edwards* would provide appellant relief.

*Edwards* holds that

when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. . . .

451 U.S. at 848, 101 S.Ct. at 1884–85. *Edwards* clearly applies to the military. *United States v. Harris,* 19 MJ 331 (CMA 1985).

We have, however, recognized a limited "overseas exception" to *Edwards* for the military. *United States v. Coleman,* 26 MJ 451, 452 (CMA 1988), *cert. denied,* 488 U.S. 1035, 109 S.Ct. 850, 102 L.Ed.2d 982 (1989). *See*

---

4. *As the offenses were committed prior to November 14, 1986, the date of enactment of the National Defense Authorization Act for Fiscal Year 1987, Pub.L. No. 99–661, § 802, 100 Stat. 3905–06, which modified the defense of lack of mental responsibility, appellant's rehearing was conducted utilizing the standards of the former defense of lack of mental responsibility in RCM 916(k), Manual for Courts–Martial, United States, 1984 (through Change 2) to wit:*

It is a defense to any offense that the accused was not mentally responsible for it. A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect the person lacks substantial capacity to appreciate the criminality of that person's conduct or to conform that person's conduct to the requirements of law. As used in this rule, the terms "mental disease or defect" do not include an abnormality manifested only by repeated criminal or otherwise antisocial behavior.

*United States v. Vidal,* 23 MJ 319, 323 (CMA), *cert. denied,* 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987). Vidal was apprehended on German soil by German law enforcement authorities on suspicion of committing an offense contrary to the laws of the Federal Republic of Germany. He was advised of his rights by the German authorities, and he asserted rights to counsel and to remain silent. Subsequently, American investigators arrived at the police station where Vidal was being detained and advised him of his rights under Article 31, UCMJ, 10 USC § 831, and *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Vidal waived his rights under U.S. law, agreed to speak to the American investigators, and made incriminating statements (which were received in evidence at his court-martial). The American investigators were not informed that Vidal had asserted his rights under German law.

We held against Vidal's contention that *Edwards* barred receipt of his admissions, concluding:

> ■ *Even if Zwemke* [the American CID (Criminal Investigation Command) agent] *had been personally aware of the request for counsel made to German authorities, we do not believe that this knowledge would have precluded him from questioning Vidal.* In this regard, we reason that a request for counsel made in connection with a foreign investigation may result only from the American suspect's unfamiliarity with the foreign legal system and does not necessarily mean that the suspect is unwilling to talk to an American investigator until he has been provided counsel. The suspect is adequately protected if he is warned of his rights under American law when first questioned by American officials. In short, we conclude that the requirements of *Edwards v. Arizona* ... [*supra,*] are not triggered by a request for counsel made to a foreign official.

23 MJ at 323 (emphasis added).

■ *United States v. Coleman,* 26 MJ at 452, was a case in which "the CID agent knew that the accused 'had refused to make a written statement' to 'the German police

and ... had requested an attorney.'" Subsequently, American military authorities advised Coleman of his rights under Article 31 and *Miranda.* Coleman waived these rights and made significant admissions to the Americans. As foreshadowed in *Vidal,* we held that the Americans' prior knowledge that Coleman had asserted his rights to German investigators did not bar the American questioning. We reiterated that

> the facts leading an American suspect to request counsel during an interview by German police may be entirely different from those affecting his counsel decision during an American interview. An accused, thus, may be entirely willing to cooperate without counsel in the latter setting, even though the added intimidations in a foreign interview may make him unwilling to do so in the former setting. Because the factors underlying the request for the assistance of counsel are different depending on the authorities conducting the investigation, we do not believe that *Edwards* or [*Arizona v.*] *Roberson* [, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988),] requires that a request for counsel made to foreign authorities applies to the initial interrogation by American authorities after such a request.

26 MJ at 453 (footnotes omitted). *See also United States v. Hinojosa,* 33 MJ 353, 355 (CMA 1991) ("appellant's request for an attorney—made to Dutch police during a Dutch investigation—may well have signaled only his discomfort in dealing with a foreign law enforcement system; it does not logically follow that he necessarily had a similar discomfort when interviewed by American investigators").

Dock, however, contends that the facts of the instant case are distinguishable from *Vidal, Coleman,* and *Hinojosa.* The distinguishing feature, according to appellant, is that his several requests for counsel occurred in the presence of American agents. Under the precise circumstances of this case, however, we do not think a different result follows.

As summarized above, appellant could have had no doubt that, initially, he was in

exclusive German custody. German law enforcement officials encountered him near the scene of the crime on suspicion of murdering a German national. He was transported by German officials in the early morning hours to a German police station where he was detained. From the outset, he was processed exclusively by German officials. Later that morning, two American CID agents, Messrs. Bowen and Robinson, arrived at the police station. Having no authority whatever to intervene, the Americans merely observed portions of the German investigation; they said nothing at this time to appellant.[5]

Accompanying the American agents was a German national named Manfred Von Wiecki, who was employed by the CID as an "Investigator/ Interpreter." He came with the American agents primarily for the purpose of translating for them. The German officials asked for a translator because the language barrier made communications between appellant and the Germans difficult. Von Wiecki was made available; however, he first identified himself to appellant and displayed his credentials.[6] Von Wiecki asked appellant if he had any objections to his translating; appellant had no objection. Thereafter, Von Wiecki merely translated— he asked no questions of his own. Von Wiecki's translation included the rights' advisement under German law.

It is undisputed by the Government that, even before the German officials advised appellant of his rights under German law (*i.e.*, before the interrogation portion of their investigation began), appellant announced generally that he wanted a "Stateside" lawyer. In response to this request, appellant was told by the Germans, presumably through Von Wiecki's translation, that he would be advised of his rights at the appropriate time. A short time later, when the German rights' advisement was administered, appellant declined to talk to the Germans. He indicated, however, that he would talk to the American investigators.[7]

At some point thereafter, the Germans and Von Wiecki removed themselves to another office to discuss the situation. One American CID Agent, Mr. Robinson, remained in a room with appellant (Mr. Bowen was temporarily out of the area). During the time appellant was alone with Robinson, he again spontaneously asked Robinson about obtaining an American lawyer. According to Robinson, appellant stated that he "did not understand or trust" the Germans and that, if he was to remain in German custody, he wanted an American lawyer with whom he could communicate. As appellant was still under German control and Robinson had no authority to intervene, even to the extent of

5. As described by Agent Robinson, the reason the American agents initially went to the German Police Station was as follows:

> To gather as much detailed information as we could as to—well, first of all, what American is being held or suspected of the crime,—to fully identify him; basically what evidence they had against him to indicate that he was involved in it; and, there again, the main purpose was to meet our timely reporting requirements we had of an incident of that nature. We had twenty-four hours to have electrical message report dispatched with as much detail as can be gathered and recorded in that time.
> As Agent Bowen put it, they were after information "to conduct interviews or background interviews of American witnesses."

6. At the rehearing, appellant acknowledged that Mr. Von Wiecki had identified himself before commencing to act as interpreter. He also admitted that, at the original trial, he had denied that Von Wiecki had ever identified himself as an interpreter. That denial was elicited in conjunction with appellant's motion at the original trial

to suppress his pretrial statement based on "the use of deception and trickery" to obtain the statements. At the rehearing, appellant blamed his original defense team for "manipulat[ing]" him and "advis[ing him] to say certain things."

7. As Mr. Von Wiecki testified on direct examination:

> I think at this particular time when he made the decision that he did not want to make a statement to the German Police, but to the CID,—if I recall right he had mentioned also,—he said, "Well, I want to stay with my own folks."
> Q. He wanted to stay with his own folks?
> A. With the Americans—to make a statement to the Americans....
>
> * * *
>
> Q. Did he express a fear with dealing with the German Police?
> A. No. According to my experience we have it quite often that the Americans prefer to talk to Americans.

advising appellant of his rights, he merely assured appellant that he "could have" such a lawyer and that his rights would be further explained to him at an appropriate time. Robinson asked no questions of appellant during this interim and made no other comment.

At the meeting in the other room, the German officials decided to let the American agents interview appellant. Accordingly, when they emerged from the meeting, the Germans made a private office available to the Americans. Only the American agents (Mr. Bowen had returned by that time) and Mr. Von Wiecki were in the room with appellant.

The American agents duly advised appellant of his right to remain silent under Article 31 and his rights with respect to counsel, including his right "to talk privately to a lawyer before, during, and after questioning and to have a lawyer present ... during questioning." Even appellant conceded at trial that the warnings were rendered prior to the Americans' asking appellant any questions. Appellant waived, in writing, his rights and agreed to talk to the American officials without consulting with counsel or having one present. The interview that followed produced the seven-page, typed, sworn confession primarily in issue in this appeal. As set forth by the Court of Military Review, the statement describes in vivid detail the gruesome sequence of events commencing with appellant's hatching of the plot; and it proceeds through his preparation for the crime, the murder-robbery itself, and his attempts to evade detection afterward. When the Americans concluded their interview of appellant, he was returned to the custody of the German authorities. He spent the night in a German jail.[8]

At the rehearing, appellant acknowledged signing the initial rights waiver and agreeing to talk to the Americans. He stressed, however, that this only occurred after he had repeatedly asked for counsel. He only capitulated and talked, he contended, because it was obvious that his counsel rights were not going to be respected.

The American officials, on the other hand, stoutly contradicted appellant's representations. Each averred that appellant *never* requested to consult with an attorney or to have one present before or during the American interview. Each testified that appellant agreed to the interview without qualification, although he indicated a desire to have counsel at his trial.

Appellant's claim, in effect that his waiver was involuntary due to a persistent denial of counsel, is undercut by the record. First, the total time that elapsed between appellant's initial request for an American lawyer during the physical-evidence-gathering phase of the German investigation and his rights' advisement and waiver at the outset of the American interview was only a matter of 2 or 3 hours.

Second, the facts and circumstances, even from appellant's own testimony, make it clear that he had no doubt who was in control at the German police station.[9] Appellant could

---

8. The next day the Americans returned. They requested permission of the Germans to take appellant to the scene of the crime to look for evidence. The Germans agreed. Appellant was again advised of his rights under American military law, and he again waived them, agreeing to accompany the Americans to the scene. By the time they got to the scene, however, the German authorities had already recovered the murder weapon. The Americans then took appellant to their own office where an additional pretrial statement was taken from him after he had again been advised of, and waived, his rights. Afterward, German officials arrived to take appellant to a German magistrate for his arraignment.

9. Asked by defense counsel on direct examination, "How was this [questioning] going on and who was conducting this and how did this conversation go?," appellant responded:

The Germans were conducting it, but Mr. Von Wiecki was interpreting it for me—because I don't speak any German.

Asked by defense counsel if he saw "anyone else around at the time who you believed to be American CID," appellant responded:

I took it for granted that the black man [Agent Bowen] was an American because you don't see very many black Germans. So I just took it that he was also an American.

Asked by defense counsel if, "several hours later, after that point, there came a time when Mr. Bowen and Mr. Robinson came in to interrogate you; and Mr. Bowen testified earlier that they read you your rights at that point. What, if

have had no doubt when it was that the Americans first took over, advised him of his rights under American law, and commenced interviewing him in the separate office. Appellant's signed, written waiver confirms that the American agents made him fully aware of the rights available to him for the asking, rights which he spurned at the time.

Further, it appears appellant may have thought he could con the American investigators, and thus talk his way out of the jam. As noted by the Court of Military Review, he was ready with a fictitious story blaming unnamed others for his crimes. Appellant did not realize, however, that a lengthening trail of independent evidence was already pointing strongly to him as the perpetrator. When confronted with this evidence, his fictitious story collapsed, and he confessed.

In addition, appellant's credibility may not have been enhanced in the military judge's eyes by his distinct pattern of selective memory. In general, appellant had excellent recall of alleged matters that arguably supported his current trial theories, but he had little or no recall of other matters. Further, it is doubtful that appellant's admission of perjuring himself in his original trial aided his cause. *See* n. 6, *supra.*

In any event, the military judge rejected appellant's claim. We agree that the judge's findings and conclusions of law are well supported by legally competent evidence. *See* Appendix (military judge's findings of fact).

The instant facts fully validate the conclusions of *Vidal, Coleman,* and *Hinojosa* that an accused's request for counsel during a foreign interrogation "may result only from the American suspect's unfamiliarity with the foreign legal system and does not necessarily mean that the suspect is unwilling to talk to an American investigator until he has been provided counsel...." *United States v. Coleman,* 26 MJ at 453, *quoting United States v. Vidal,* 23 MJ at 323.

■ An exercise of a right to counsel under American law does not mean that counsel must be instantaneously supplied. What it means is that investigators must terminate their conversation with the accused and cannot reinitiate contact with him *until* such counsel is provided; otherwise any statements taken will be suppressed. Had appellant expressed a wish to consult with counsel or to have counsel present after the Americans received permission to talk to him, the CID agents obviously could not have proceeded to question him. However, after having clearly been turned over by the German authorities to the American authorities; having been apprised of his rights anew under American military law; having been offered the right of counsel, *inter alia;* and having declined counsel and agreeing to talk with the American investigators, appellant cannot now disavow his waiver of his Fifth Amendment right to the presence of counsel. *See United States v. Schroeder,* 39 MJ 471 (CMA 1994).

We hold that the military judge did not err in receiving appellant's pretrial statements into evidence.

### III

■ Regarding the remaining issue, appellant contends that the military judge abandoned his neutral role at the court-martial in the course of posing several hypothetical questions to defense experts. In particular, appellant argues that, in formulating these questions, the judge presented a completely one-sided, pro-prosecution view of the underlying facts of the offense. This portrayal, appellant suggests, tended to emphasize that vision of the facts to the factfinder, to the exclusion of facts and interpretations viewed by the defense as being potentially exculpatory. The evidence appellant specifically cites as omitted would have emphasized his level of intoxication and erratic behavior at various points prior to commencement of the fatal sequence, as well as after his chance return to the scene of his crimes when he became a suspect. We think appellant misconstrues

---

anything, did you say about a lawyer at that point?," appellant responded:

That I wanted one from the States. I wanted an American attorney, but I was going to make a statement now.

not only the effect of the judge's questions, but also their purpose.

To put the matter in context, it must be remembered that the defense was presenting an insanity defense exclusively, against the backdrop of a powerful factual case. Before the first defense expert took the stand, the factfinders knew in graphic detail what appellant did and what he said from the alpha to the omega of this foul deed. Nothing the military judge mentioned, in the course of formulating his hypotheticals, bore the slightest risk of erasing from the court members' minds the vivid testimony of the witnesses, the physical evidence, and appellant's own confession.

Appellant's problem, at the rehearing, was this massive amount of evidence that was subject to interpretation as a course of conduct that was deliberate, reflective, goal-oriented, and controlled—notwithstanding appellant's obvious state of intoxication and his sometimes erratic behavior. Thus appellant's objective was to raise a reasonable doubt with the factfinders that he was nevertheless not in control and not mentally responsible at the time of the commission of the offense. To that end, the defense mustered an impressive array of experts who evaluated appellant months, and in some cases years, after the fact. These defense experts concluded or hypothesized to various degrees that appellant did not meet the appropriate standards for sanity at the time of the offenses. *See* n. 4, *supra.*

The first expert the defense called during its case-in-chief was Lieutenant Colonel Strathmore K. McMurdo, Jr., U.S. Army, a neuroradiolgist. He reviewed a series of brain scans taken of appellant. In sum, LTC McMurdo opined that appellant's brain ventricular system was "definitely abnormal,— definitely enlarged. I would probably say that the ventricular system is moderately to markedly enlarged." However, LTC McMurdo was unable either to pinpoint the cause of the condition or to predict whether it might produce any physical effects. He could not state that the ventricular enlargement constituted "brain damage" in any form. He also could not speculate whether

the enlargement would have led to "behavior disorders." LTC McMurdo had never met appellant, and he offered no opinion of his mental responsibility.

The military judge posed no hypothetical questions during the testimony of LTC McMurdo. His only intervention, from time to time, was to cause the witness to translate certain medical terminology into language the members could understand.

The next defense expert was Dr. Iris Marie–Louise Dauner, a German civilian, whom the military judge permitted to testify as an expert in the fields of neurology, children's psychology, and psychotherapy. Dr. Dauner first examined appellant in July 1984, approximately 4 weeks after the incident. Appellant was not very cooperative with Dr. Dauner, limiting her ability to evaluate his condition. Ironically (*see* n. 7, *supra*), Dr. Dauner testified:

> The main difficulty was that he wanted to have an American psychiatrist and he wanted to be in front of an American court. He thought that the examination conducted by me would only serve our system.

Based on an electroencephalogram (EEG) and her own psychological testing, Dr. Dauner originally concluded that appellant showed no indications of epilepsy or cerebral disorder.

However, as a result of learning about various tests and reports made by other experts several years later, as well as information later provided about appellant's childhood, adolescence, and prior military career, Dr. Dauner modified her original opinion. At the time of the rehearing, she believed that "brain organic damage is probably there." She

> believe[d] that together with the brain organic damage, the personality disorder that we have found and the influence of alcohol, he was considerably limited in controlling his behavior [at the time of the offense].

Based upon her assumption that the diagnoses and information subsequently provided her were correct, she came to believe that appellant "in June of 1984 had a serious mental disease or defect[.]"

Dr. Dauner's testimony was presented by the defense and tested by the prosecution in cross-examination almost entirely in diagnostic terms. The only references to underlying facts or appellant's conduct related to incidents which had allegedly occurred in appellant's youth or prior military career. Counsel completely omitted to ask Dr. Dauner about, and she did not volunteer any opinion about, a linkage between her diagnosis of appellant's mental condition and appellant's ability to perform and sustain the multi-hour sequence of events that culminated in the killing of Herr Engelhardt and appellant's apprehension.

After counsel's examination, the military judge, at the behest of a court member (*see* RCM 614(c), Manual for Courts–Martial, United States, 1984) asked the witness a brief series of questions about the effect, if any, of appellant's enlarged brain ventricles, coupled with alcohol, on his behavioral control. Dr. Dauner responded that "[a]ll brain organic disturbed humans are more unstable than healthy ones." With specific reference to alcohol, she testified:

> With individuals that have brain organic damages, it's almost always enough, an insignificant amount of alcohol in order to go over the barrier of inhibition. Without alcohol with humans that have brain organic damages, defects, it is also that they become frustrated very fast and react aggressively.

Apparently these questions and responses prompted the military judge to construct a hypothetical question relating to evidence already before the court members. He asked Dr. Dauner:

> Assume, Dr. Dauner, that the accused in the early morning hours of 12 June, after consuming possibly one to two liters of wine, fortified wine, he discussed with his roommate a plan to rob a taxicab driver. The purpose of the plan is to gain money to support a friend's trip to the United States to take care of an emergency with the friend's father, an illness. Assume that he asked his roommate to join in this plan and offered to share some of the proceeds with his roommate. Assume fur-

ther that the accused displayed a knife, a very sharp knife with a blade about thirteen centimeters. Assume that he discussed the possibility with his friend of taking the cab driver or asking the cab driver to go to a back road for the purpose of robbing the cab driver. Assume further that he discussed cutting the cab driver's throat. Assume that after that he went to his place of duty for the purpose of obtaining gloves to prevent finger prints from being found at the scene of the crime. Assume further that the accused did indeed obtain a taxi and did inflict a deep cut to the taxi driver's throat, plunged the knife into the taxicab driver's heart and inflicted approximately five to six other deep cuts to vital areas of the body. Assume further that the accused took the money belonging to the cab driver, discarded the knife down an embankment, discarded bloody gloves and was attempting to return to his barracks. Assume further that he is placed into a police car and is told by the police that he's not going to go to his barracks but rather go to Giessen and be turned over to the MPs to be returned to his barracks. Assume further that the police at this time do not know of the taxi incident. That upon returning in the direction of the taxi where the body of the cab driver is located, the accused begins to exhibit extreme signs of nervousness and secretes the driver's license, wallet and money and passport that he had obtained from the cab under the floor mat of the police car.

> Now, going back to your opinion that the accused had a mental disease or defect that you define as a borderline syndrome, and your belief that the accused is suffering from organic brain damage, *how do you relate a condition that you believe now to exist, to have existed in the accused on 12 June 1984 to that alleged behavior?*

(Emphasis added.) Essentially, this hypothetical and similar ones propounded to other experts form the core of this issue on appeal.

The defense objection to the hypothetical was overruled, and the witness was permitted to respond. She opined that the course of conduct was completely consistent with

her diagnosis, as she proceeded to explain in some detail. The military judge asked no further questions of the witness. Follow-up questions by counsel ensued, giving Dr. Dauner further opportunity to articulate her views on appellant's condition as it related to his ability to control his behavior at various points throughout the progression of the fatal events.

The next defense witness was Colonel Edwin Healey, U.S. Army. He was qualified as an expert in the fields of neurology and psychiatry. His testimony was somewhat similar to Dr. Dauner's. He believed essentially that appellant's enlarged brain ventricles caused certain brain malfunctions which, coupled with clinical depression and the ingestion of alcohol, resulted in violent irresistible impulses and appellant's inability to control himself or to deviate from a course of action once set. He believed appellant's condition constituted a mental disease or defect which, at the time of the offense, caused appellant to lack substantial capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law.

Like Dr. Dauner, Colonel Healey testified, at the behest of counsel, virtually entirely in diagnostic terms. As before, Colonel Healey was not asked to correlate his diagnosis of appellant's mental condition with the evidence already before the factfinders of appellant's actions on the night in question. The few references Colonel Healey was asked to make to conduct related to other violent or irrational actions attributed to appellant at earlier points in his life.

As with Dr. Dauner, a court member, through the military judge, asked a question of Colonel Healey regarding the effect of alcohol and appellant's mental defect on his "behavior to the extent that he committed the crime." Civilian defense counsel followed with several questions of his own along those lines. After Colonel Healey's response, indicating that it was a combination of alcohol and organic damage that was responsible for appellant's conduct, the military judge asked Colonel Healey a brief series of questions, without defense objection, regarding whether he agreed with LTC McMurdo in certain respects relating to the effects of brain ventricular enlargement (Colonel Healey agreed with LTC McMurdo); regarding Colonel Healey's basis of knowledge about appellant's prior violent acts and his understanding of them; and regarding Colonel Healey's knowledge of the facts of appellant's conduct in the course of the killing of Herr Engelhardt.

Over defense objection, the military judge then unleashed another lengthy hypothetical question similar to that put to Dr. Dauner. After reciting the arguable facts of appellant's actions, the military judge inquired, "Now, is that in your opinion consistent with his irresistible impulse that you described?" Colonel Healey stated that it was consistent with his diagnosis and, at the military judge's urging, explained to the court members his reasoning. A brief series of questions by counsel and a court member followed.

The final expert called by the defense in its case-in-chief was Dr. Janieth Wise, whom the court recognized as an expert in psychiatry and neuropsychology. Though she was a civilian at the time she evaluated appellant, she had previous experience as an Army psychiatrist. Her evaluation of appellant occurred several years after the offenses, and her testimony alone occupies well in excess of 100 pages of the record of trial. As with all of the experts, a comprehensive summary of her testimony is not here possible. Essentially, however, she concluded that appellant suffered from a mental disease or defect which she described as

an organic brain disorder, ventricularmegaly [sic] dilated ventricles, creating a framework in a bed upon which rests my second diagnosis, complex partial seizure disorder, and my third diagnosis of alcohol and drug addiction.

As a result of this condition, she did "not believe [appellant] could conform his conduct [to the requirements of the law] nor could he fully appreciate his criminality."

Unlike their examination of prior witnesses, both counsel directed considerable effort to relating the witness' conclusions to the fact pattern of the robbery-murder in issue.

At one point, for example, defense counsel asked:

Now, you related some facts earlier about the night of the offense. One interpretation of these facts might be that Private Dock was apparently making some type of a plan and then taking actions designed to carry out that plan. Is that inconsistent with your seizure theory in any way?

Dr. Wise explained at some length that the conduct was not inconsistent, stating: "Folks in a seizure state can complete successfully consecutive appropriate appearing tasks and still be actively seizing."

Later, she added:

I think at some point during that period he was actively having a temporal lobe seizure and was forming automatic behaviors and then a fugue like state, and following some of the postictal behavior also. So, I believe that was active occurrence.

She defined "fugue like state" as follows:

Going back to the automatic behavior where he's carrying out sequences of events without any memory of doing so, or any knowledge that he is really doing it. He had no memory whatsoever.

The court members initially had no questions, and the military judge did not ask any questions in hypothetical format. Without specific defense objection, however, the judge did ask Dr. Wise to explain appellant's actions of hiding the victim's property "under the floor mat of the police car," as it related to the witness' view that appellant was operating under "automatic behavior." The witness explained how, in her view, this action was consistent with her diagnosis.

The judge also asked several questions about the triggering effects, if any, on temporal-lobe seizure of emotional shock, withdrawal from certain drugs (with which appellant had been treated post-apprehension), and withdrawal from alcohol. In addition, the judge asked how appellant's obtaining gloves on the night in question (to avoid leaving fingerprints) fit in with the witness' diagnosis of substantial impairment in appreciating criminality. The witness responded by explaining automatism and reiterated her understanding that appellant's conduct was consistent therewith. Follow-up questions by counsel and a court member ensued.

The Government called several experts in rebuttal. The first witness was Dr. Frances Jordan, an expert in clinical psychology and neuropsychology. She tested and examined appellant in the summer of 1987, about 3 years after the offenses. She found him to be "a very bright individual," and "[h]e was very cooperative." Dr. Jordan diagnosed appellant as having a "maladaptive personality," in that he "tend[ed] to see life sort of—I use the term in here as a 'gladiator's arena' that there is a competition that is always going on, and that you have to sort of fight to get what you want."

Dr. Jordan was not asked for a formal opinion of appellant's ability to appreciate the criminality of his acts or to conform his conduct to the requirements of the law on the night of the offenses. However, she stated that her testing did not disclose evidence of "organic damage or deficits." Regarding appellant's response to alcohol, she saw "no difference, no clinical difference between what I have been told of his behavior and the behavior of various other people when intoxicated." Neither the court members nor the military judge asked Dr. Jordan any questions.

The next government witness was Colonel Richard A. Calkins, U.S. Army, a neurologist. He participated in a series of EEGs conducted on appellant in 1985 and 1987. In one of the studies, appellant's blood alcohol was deliberately elevated in order to determine if he "had a seizure disorder which may have been triggered by alcohol." The studies were "normal," with no evidence of petit mal epilepsy or organic brain damage found. Colonel Calkins was not asked for a formal opinion of appellant's ability to appreciate the criminality of his acts or conform his conduct to the requirements of the law on the night of the offenses.

On cross-examination, civilian defense counsel launched an eight-page series of questions and responses about whether "an individual [who] has psychomotor epilepsy as manifested by automatisms ... can perform

ordinary apparently purposeful type activity." Colonel Calkins responded that such individuals can perform ordinary functions,

> [b]ut with certain imperfections. They tend to be cloudy and confused and conduct it improperly.... Usually they appear glassy eyed, inassessable [sic], and they may not respond appropriately or they may respond and their response may be inappropriate.

Colonel Calkins doubted that many "neurologist[s] would ... accept that a planned murder, contemplated over several hours is going to be the result of a temporal lobe seizure."

After counsel had concluded their questioning, a court member, through the military judge, asked the witness a series of questions relating to how "an automation type seizure" is triggered and whether "alcohol alone [could] cause the same symptoms as automatism such as the performance of a complex sequence of events without knowledge of one's actions." In addition, the member asked for an explanation of "the erosion of brain spurs caused by blood vessels and pressure around the brain."

Afterward, the military judge, over defense objection, asked Colonel Calkins a lengthy hypothetical question incorporating facts similar to those included in the hypotheticals put to Doctor Dauner and Colonel Healey. At the conclusion of the hypothetical, the military judge inquired:

> Do those sequence of events indicate to you that the accused was undergoing any type of epileptic seizure to include an automatic type seizure or temporal lobe seizure?

The witness then explained why, in his view, the course of conduct described was not consistent with such seizures. Lengthy recross-examination in that regard by defense counsel followed.

The final government expert in rebuttal was Dr. Nikolos Golosow, a psychiatrist. A civilian at the time of the rehearing, Dr. Golosow was a retired Army Colonel who had evaluated appellant in 1987 while still on active duty. As a result of his evaluation, Dr. Golosow concluded that appellant "did suffer from a mental disease" and "defect" at the time of the offense:

> Specifically, ... a [sic] atrophy or—in the limbic area, and adjacent to the ventricles. That was secondary to a hydrocephalus and presumably having occurred in childhood, which caused a [sic] increased cerebral pressure, dilating the ventricles and in most probability, impinging on the adjacent areas and causing possibly some atrophy....

Dr. Golosow reached this conclusion by "ma[king] the assumption on the basis of the dilated ventricles and on the responses—the aggressive response to intoxication," even though he recognized that "the objective tests [which "sometimes ... don't necessarily demonstrate pathology or atrophy or damage when the damage may be mild"] were negative."

Trial counsel, on direct examination and without defense objection, then uncorked a six-page hypothetical, incorporating factual assumptions relating to appellant's actions during the offense. Trial counsel concluded by asking the witness, "[a]ssuming all of that," did appellant have "the ability," on June 12, 1984, "to premeditate a murder?"; did he have "the ability to specifically intend to rob the cab driver?"; and did he "lack[ ] substantial capacity to appreciate the criminality of his acts?"

The witness opined against appellant on all questions. He specifically commented:

> I was really struck yesterday when I listened to some of the testimony over here, and specifically as I heard that he spent some time in a guard shack basically transacting a totally different piece of business before he went on to the [sic] pursue what he originally had in mind. Somehow, that didn't seem—that somehow seemed like relatively good control to me. On that basis, I do not think that he had the substantial—a substantial decrease in his capacity to adhere to the standards of the law.

On cross-examination, Dr. Golosow acknowledged that, only the day before, he was expecting to testify favorably for appellant regarding capacity to appreciate criminality.

He further acknowledged that, at the time he originally formulated his opinion, 1987, he had been provided with "basically the same information" which trial counsel recited in his lengthy hypothetical. He also acknowledged:

There is no new information except to hear in the courtroom he was in my mind at least very much highlighted as to the sequence of events and specifically the time that was spent in the guard shack, which did not at that particular time [1987] strike my mind as clearly as it did over here.

After counsel concluded their questioning, the court members had no questions of the witness. The military judge asked a short compound question relating to the significance of appellant's discussing his plan to rob a cab driver, his decision "to first obtain gloves" to avoid leaving fingerprints, and his threat to harm the roommate if he told anyone. The judge asked the witness "what effect" these actions had on the witness' "opinion as to ... [appellant's] ability to appreciate the criminality of his acts? Is there any significance [at] all to that?" Dr. Golosow felt that these actions implied that he realized what he planned to do was "against the law" and that, therefore, he "appreciate[d] the criminality of his acts."

In surrebuttal, the defense called Dr. Paul R. Epp, a psychiatrist. Dr. Epp had formerly served on active duty in the Army and had treated appellant for about 18 months after the offense. However, he had not, at that time, made a diagnosis of appellant's condition. Indeed, it was not until shortly before the rehearing, in late 1989, that Dr. Epp formulated an opinion regarding appellant's mental responsibility at the time of the offense. At the rehearing, Dr. Epp concluded that, as a result of mental disease or defect, appellant "lacked substantial capacity" to "appreciate the criminality of his actions" or "to conform his actions within the requirements of the law."

On cross-examination, without defense objection, trial counsel began to walk Dr. Epp through a lengthy, multi-part hypothetical question, assuming as fact evidence of appellant's conduct as presented by the prosecution. At various points in the narrative, trial counsel stopped to ask Dr. Epp if it appeared appellant was acting under control at that point. Thus through that phase of the evening in which appellant discussed his plan with his roommate, indicated his intent to get gloves to avoid fingerprints, and threatened the roommate if he told anyone, Dr. Epp acknowledged:

He—well, I think what you're seeing here is, yes, there are some considerations for getting caught, that's true. He also gravitates toward an absolute of "let's eliminate this guy." In terms of that, yes, there is some degree of consideration of consequence at this point.

Through that phase of the evening in which appellant concealed the weapon, went to the unit police shack to get the gloves, engaged the Sergeant in charge in a conversation about changing shifts, and displayed the weapon to him, the expert agreed:

Yes, you're saying that there is—okay. Let's say it this way, given the way you've presented it, given the information you have, it is controlled thinking. It is rather unusual to show somebody that you are talking to the unit police with the murder weapon that you're going to use to murder somebody.

Through that phase of the evening in which appellant announced to the supervisor that he had "business to take care of," left the building, responded to a question from another unit policeman, and walked to the front gate cab stand, the expert agreed:

He was involved in goal directive. In regards to what you are saying, he's walking, he [sic] moving in the direction, and he's involved in some goal directive behavior at that point.

Through that phase of the evening in which he hired the cab, maneuvered the driver to an isolated area, demanded money, stabbed the driver in the neck, pulled him out of the cab, stabbed the driver repeatedly in vital areas as the driver struggled to defend himself, the expert believed: "The act of multiple stabbing does not seem to be a very controlled act." However, "[a]s a medical doctor," Dr. Epp agreed that the wounds to

the neck, heart, and liver did not "look indiscriminate ... [not] wildly placed."

Through that phase of the evening in which appellant stole the victim's wallet and papers; crossed over the autobahn to an embankment and threw over the knife, its sheath, his gloves, and the empty wallet; was seen by the German police; calmly negotiated his return to military control by the police; became nervous as the police were called to the crime scene; and secreted evidence under the floor mat, the expert agreed that it did not appear to be "an uncontrolled, irreversible course of events."

Trial counsel concluded with the following series of questions:

Q. And assuming the hypothetical that you've been given, is it your opinion that the accused in that hypothetical would be able to premeditate murder?

A. In that hypothetical he appears to be able to premeditate, yes.

Q. And specifically intend to rob?

A. And specifically intend to rob.

Q. In that hypothetical as presented, would the accused be able to appreciate the criminality of his conduct?

A. He would appear to know that something was wrong, something he had done was wrong.

Q. And would he be able to conform his conduct to the requirements of the law?

A. Yes.

On redirect examination, the expert acknowledged that he had been "aware of many of the facts" trial counsel included in his hypothetical and that he was aware of "other facts" not mentioned by trial counsel. He adhered to his view that "there was considerable irrationality, single option nonperspective, and that ... [appellant] did proceed in the way we had talked [about] earlier"; that appellant "lacked substantial capacity to appreciate the criminality of his actions and to conform his conduct" to the requirements of the law; and that "his actions reflect the effects of pathology [sic] brain damage and the impairment upon his thinking process."

Neither the court members nor the military judge had any questions of Dr. Epp.

Prior to findings, the military judge instructed the members extensively on the applicable legal standards and the evidence before them. From the outset, he instructed the members that they were "the sole determiners of the facts in this case" and that, if their memory of the facts differed from the judge's or counsels', they must "apply" their "own memory." He reiterated this point on at least two other occasions.

In summarizing the evidence of appellant's level of intoxication, he outlined the following evidence stressed by the defense:

(1) The testimony of SGT Korpash [appellant's roommate] that the accused consumed a bottle to a bottle and a half of wine and that PFC Dock was pretty well drunk and wasn't all there.

(2) The testimony of the German Police Officer Kletzander [one of the officers who picked appellant up on the autobahn] that PFC Dock was tipsy and smelled of alcohol.

(3) The testimony of Mr. Michael Dewey [the former servicemember whose father was in critical condition in the states] that PFC Dock was extremely drunk at about 2300 hours on the evening of 11–12 June 1984; had fallen on his back and was unable to get to his feet, and further described PFC Dock as rolling around on his back like a turtle, and that finally someone had to assist PFC Dock to his feet.

(4) The stipulation of expected testimony of Mr. Joseph Rosebush [a former servicemember who had lived in the barracks with appellant] that between 0130 and 0200 hours in the early morning of 13 June 1984, he saw PFC Dock and PFC Dock was "pretty drunk," fell to the floor and had to be assisted to his feet; that when PFC Dock walked he staggered, did not have balance and SSG Rosebush had to help him downstairs and to his room and that whenever PFC Dock spoke he smelled heavily of alcohol.

(5) The stipulation of expected testimony of Mr. Gary Sweet [a former servicemember who was on duty at the Unit Police shack] that PFC Dock at about 0210 hours on 12 June 1984 told him he was

drunk, that PFC Dock had a funny look in his eyes and could not stand still without swaying; that, when PFC Dock left the guard shack at 0300 hours he looked dazed, his eyes were glassy and that he was so drunk that Dock would have lost his balance if he had looked around.

(6) The evidence that a blood alcohol test was taken at 0450 and 0505 hours on 12 June 1984, and that respectively the tests showed a blood alcohol level of 1.65 and 1.63. Further consider the evidence that using the highest reverse calculation the blood alcohol level of the accused at the time of the alleged incident was between 1.9 and 2.0.

The judge also summarized the evidence to the contrary suggesting that, notwithstanding his inebriation, appellant seemed to some witnesses to be functioning without significant impairment.

Further, in connection with the asserted mental-responsibility and partial-mental-responsibility defenses, the military judge summarized the evidence tending to support those defenses. In addition to summarizing the testimony of the defense experts, the judge instructed the court members to consider the following items regarding those defenses:

(1) The testimony of Korpash that Dock's statement about a "rad" killing Dock's father made no sense; that Dock looked like he was someplace else; that, Dock's behavior was totally different from his past behavior; that Dock behaved like a crazy person; that, being in the room with Dock was like walking into a mental institution; that it appeared something snapped in Dock and his mood was constantly changing.

(2) The testimony of the German Police Officer Herr Stefan [the police captain in charge who observed appellant at the scene of the crime and at the station] that PFC Dock said he "shot" Claus Engelhardt by jumping up and yelling "Boom, boom, I killed him"; that several times PFC Dock radically shifted behavior; that PFC Dock exhibited erratic behavior so that Stefan thought drugs might be in-

volved, although subsequent drug tests proved negative; that in his experience as a police officer the behavior of PFC Dock was not consistent with someone who was only drunk, and that PFC Dock appeared unable to control his emotions.

\* \* \*

(5) The testimony of Mrs. Dock, the mother of the accused, that PFC Dock suffered three distinct head injuries where he lost consciousness: One in January or February 1982 when he fell on some ice, one in October or November 1982 when he hit his head on a goal post while playing soccer, and finally, that he fell from a second story while on a construction job; and that PFC Dock had headaches on and off as a child which intensified after the accidents.

(6) The testimony of Herr Witt, the German cab driver, that he had the impression that PFC Dock in the early morning hours of 12 June 1984 was crazy, with sporadic movements, mimicking and stammering, and that a police officer on the scene said something about PFC Dock being crazy.

The military judge also summarized the evidence tending to suggest that appellant was not lacking mental responsibility at the time of the offenses.

Regarding hypothetical questions, the judge instructed as follows:

When an expert witness answers a hypothetical question, he or she assumes as true every asserted fact stated in the question. Therefore, unless you find that the evidence establishes the truth of the asserted facts in the hypothetical question, you cannot consider the answer of the expert witness to that hypothetical question.

### IV

■ It has long been the law in the military that the military judge has the power to ask questions of witnesses. Mil.R.Evid. 614(b), Manual for Courts–Martial, United States, 1984, provides:

The military judge or members may interrogate witnesses, whether called by the

military judge, the members, or a party. Members shall submit their questions to the military judge in writing so that a ruling may be made on the propriety of the questions or the course of questioning and so that questions may be asked on behalf of the court by the military judge in a form acceptable to the military judge. When a witness who has not testified previously is called by the military judge or the members, the military judge may conduct the direct examination or may assign the responsibility to counsel for any party.

See also paras. 39b (4); and 149b (3) [changed to Mil.R.Evid. 614(b), effective Sept. 1, 1980, Exec. Order No. 12198, 45 Fed.Reg. 16, 976, and 16, 993 (1980) ], Manual for Courts–Martial, United States, 1969 (Revised edition).

Before there were military judges, there were law officers who had the same authority. Paras. 39b (2) and 149b (3), Manual for Courts–Martial, United States, 1951. Federal District Judges also have the power to question witnesses. Fed.R.Evid. 614(b).

In *United States v. Tolppa,* 25 MJ 352 (CMA 1987), we specifically held that the military judge's authority to question witnesses includes the right to ask hypothetical questions. The limitation, as always, is that the judge must be careful not to "abandon his role as an impartial party and assist in the conviction of a specific accused." *United States v. Reynolds,* 24 MJ 261, 264 (CMA 1987); *cf. United States v. Hardy,* 30 MJ 757 (ACMR 1990), *pet. denied,* 32 MJ 486 (CMA 1991).

In *United States v. Norris,* 873 F.2d 1519, 1526 (D.C.Cir.), *cert. denied,* 493 U.S. 835, 110 S.Ct. 113, 107 L.Ed.2d 75 (1989), where the District Judge had cross-examined the defendant extensively, the Court of Appeals aptly described the delicate balance that trial judges must maintain and the appropriate review posture as follows:

In viewing these and all other questions by the Judge, we must remember that our analysis must be a prospective one. "Before the answers were given by the witness[ ], [the trial j]udge ... had no way of knowing what the answers would be...." *United States v. Patterson,* 652 F.2d 1046, 1048 (D.C.Cir.),

*cert. denied,* 454 U.S. 904, 102 S.Ct. 412, 70 L.Ed.2d 223 (1981). Given the prospectivity of the analysis and the leeway for the conduct of trial and the pursuit of truth necessarily afforded a trial judge, we find no reversible error in the Court's conduct of questioning in the present case. We nonetheless feel constrained to once again put forth the admonition that "[p]articularly when the questioning is designed to elicit answers favorable to the prosecution, 'it is far better for the trial judge to err on the side of [a]bstention from intervention in the case.' " *United States v. Green,* 429 F.2d 754, 760 (D.C.Cir. 1970) (quoting *Blumberg v. United States,* 222 F.2d 496, 501 (5th Cir.1955)).

In the instant case, appellant's complaint that the military judge presented a one-sided, pro-prosecution view of the underlying facts of the case is not well taken. In his instructions on findings, the military judge fairly and comprehensively summarized the evidence on behalf of the defense, including all those matters appellant now complains were lacking in the hypotheticals. In addition, the judge clearly explained, in his instructions, how hypothetical questions worked. On this record as a whole, we detect no evidence that the military judge tilted toward the prosecution and no possibility that the court members could have been misled as to the underlying evidence in the case.

Moreover, the purpose of the hypothetical questions was clearly narrow. One aspect of what the judge was asking, of experts on both sides, was whether a person suffering from a given mental disease or defect was physically capable of constructing the sequence of events that appellant allegedly accomplished. Another aspect of his question was—what would it mean, with respect to appellant's ability to control his conduct and appreciate its criminality, if he said the things that it was claimed he said, interacted with various people in the way that it was claimed that he interacted, and made the various elections and decisions that it appeared he made? These questions were, in our view, absolutely neutral.

There is no reason to suppose the military judge had any idea what an individual is capable of who is experiencing automatism, fugue-like state, or temporal-lobe seizure. That is why we permit experts to educate jurors. Mil.R.Evid. 702. All the military judge did here was to put his finger on a point not then adequately covered by direct or cross-examination and to ask the experts to illuminate the matter. Given the gist of these narrow questions, it did not matter how drunk or bizarre appellant may have seemed before, during, or after the events. Plainly, these questions were focused on how the experts' opinions correlated with what independent evidence suggested appellant did and said, not an overall assessment of appellant's mind or personality.

Appellant's implicit complaint—that the effect of these questions was detrimental to him nonetheless in that it undermined the force of his experts' opinions—is also not well taken, for as the *Norris* court stated, our analysis is prospective, not retroactive.

Further, we do not accept the implication that appellant would have been better off if only the expert inquiry could have been kept away from the underlying facts of the offenses. It must be remembered that, before any expert took the stand, the court members had heard days of testimony from numerous witnesses on what appellant did and said before, during, and after the crimes. The court members were, in fact and in law, the world's leading experts on appellant's conduct. Their knowledge of the underlying facts of the case greatly exceeded that of any of the experts. Moreover, their judgment of what appellant actually did became society's official determination of what appellant actually did.

It is most unlikely, in our view, that any expert could come before that particular body and pontificate persuasively on appel-

lant's mental processes without correlating that opinion with such conduct as the court members knew had occurred. In other words, it was the military judge who first gave the defense experts the opportunity to be persuasive. That is not being biased. Accordingly, we do not indulge the speculation that the defense experts would have been more credible and more persuasive to the factfinders if they had only been shielded from addressing the underlying facts.[10]

Thus appellant's rehearing ended exactly where it began—with the court members riveted on appellant's state of mind as he careened through the fatal course of events of June 12, 1984. We do not underestimate the difficulty of resolving such factual matters as appellant's intent at the time of the offenses, his capacity to appreciate the criminality of his acts, and his capacity to conform his conduct to the requirements of the law. Something over 500 pages of this record of trial are devoted exclusively to expert testimony regarding appellant's state of mind. What is clear is that the court members did not take these matters lightly, for the record reveals that they posed penetrating and germane questions to the experts throughout.

Whether, in the end, appellant is really just another sociopath, whose vicious and amoral tendencies are unleashed by the excessive consumption of alcohol, or whether he is a deeply disturbed individual suffering from a serious mental disorder are questions whose conclusions are likely to remain in the eye of the beholder forever. What we can say as an appellate tribunal, at this point 10 years into the legal odyssey, is that these very difficult questions have been thoroughly examined to the extent of fallible human knowledge,[11] that the cumulative results of this extensive endeavor have been fairly put to a responsible factfinder, that the factfinder

---

**10.** Note that the military judge also gave the following instruction on evaluation of testimony:

Now, you are not bound by the opinions of either expert or lay witnesses. You should not arbitrarily or capriciously reject the testimony of any witness, *but you should consider the testimony of each witness in connection with the other evidence in the case and give it such*

*weight as you believe it is fairly entitled to receive.*

(Emphasis added.) *See* para. 7–7, Military Judges' Benchbook at 7–9 (Dept. of the Army Pamphlet 27–9 (Change 3, 1989)).

**11.** *See generally* J. Ziskin and D. Faust, *Coping with Psychiatric and Psychological Testimony* (Law and Psychology Press, 4th ed.1988).

was properly asked to resolve the pertinent issues, and that, to the best of their ability, they resolved those matters—adversely to appellant in this case. In these proceedings, we detect no legal error which materially prejudiced the substantial rights of appellant. Art. 59(a), UCMJ, 10 USC § 859(a). Indeed, due to the exhaustive and thoroughly professional efforts of all counsel concerned and the military judge, the issues in this complex case have been at least as well litigated and presented as any we have seen. The judgment of the factfinder stands.

The decision of the United States Army Court of Military Review on further review is affirmed.

Chief Judge SULLIVAN Judges GIERKE and WISS, and Senior Judge EVERETT concur.

Judge CRAWFORD did not participate.

## APPENDIX

MILITARY JUDGE'S FINDINGS OF FACT

I make the following findings of fact in connection with the motion to suppress the statements allegedly made by PFC Dock on 12 and 13 June 1984 to the American CID Agent Bowen:

One, around 1100 hours on the morning of 12 June 1984 Private First Class Dock was alert and he did not appear to be under the influence of alcohol;

Two, Mr. Von Wiecki was present during some of the forensic processing of the accused around 1100 hours on the 12th of June 1984;

Three, at the time Mr. Von Wiecki was an interpreter and credentialed agent for the CID, Butzbach Field Office;

Four, Mr. Von Wiecki was present at the request of the German Police authorities, who asked them to assist in interpreting questions of the accused during the preliminary forensic processing of the accused on matters relating to non-accusatory questions such as unit identification, place of birth, and also to advise the accused of his rights under German law;

Five, the accused was asked by Mr. Von Wiecki if he objected to Mr. Von Wiecki interpreting, and the accused said, no;

Six, Private First Class Dock was not asked questions by the German Police officials about the charged offenses;

Seven, when asked about his rank by a German Police Officer who was taking personal data the accused said, "I want a lawyer from the States" in the presence of Mr. Von Wiecki;

Eight, the accused was told by the German Police official he would be advised of his rights before he was questioned about the offenses he was suspected of committing;

Nine, Mr. Bowen, the CID Agent at the time in Butzbach for whom Mr. Von Wiecki worked, was present in the room observing what was taking place, and heard the accused ask for an attorney from the United States; this request being made in response to the question asked him by the German Police official about his rank;

Ten, the accused made his statement for a Stateside attorney in response to a question from a German Police official who was conducting an investigation then being conducted by the Sovereign Nation of the Federal Republic of Germany;

Eleven, the accused was not questioned by the German Police at the behest of American authorities;

Number twelve, the accused said in the presence of Mr. Von Wiecki, "I want to stay with my own folks";

Thirteen, after being advised of his rights under German law, and while in the custody of the German Police officials, the accused stated that he understood his rights to remain silent, his right to consult with an attorney, and apply for additional inquiries;

Fourteen, while declining to talk with the German Police the accused did make an express request to the German Police officials that he wanted to make a statement to the United States Army CID;

Fifteen, at 1345 hours on 12 June, in an office provided to Mr. Bowen at the Ger-

man Police Station, the accused said he wanted to make a statement to the CID, whereupon Mr. Bowen told him he would first have to be advised of his rights under Article 31 of the UCMJ;

Sixteen, Mr. Bowen advised the accused of his rights under Article 31 of the UCMJ and determined that the accused understood these rights, and was alert, and not apparently under the influence of alcohol. The accused understood his rights and voluntarily waived his rights to have counsel present, to consult with counsel, and agreed to make a statement without the benefit of counsel;

Number seventeen, the accused was again advised of his Article 31, UCMJ, rights on 13 June 1984 and expressly waived his rights to include consulting with a lawyer and having a lawyer present while these statements were being made;

Eighteen, both on the 12th and 13th of June 1984 the accused fully understood his rights and intelligently waived his rights under Article 31 of the UCMJ;

Nineteen, when the accused made his request for a Stateside attorney to the German Polizei both the German[s] and Americans were conducting separate investigations on behalf of their respective sovereigns;

Finally, Number Twenty, at no time did the accused ask to consult with counsel or have counsel present before making his statement to Mr. Bowen.

Therefore, I find that the requirements of *Edwards v. Arizona* were not triggered by the request for Stateside counsel made in response to a question by an official conducting an investigation on behalf of his foreign sovereign, the Federal Republic of Germany. Therefore, the motion to suppress the statements made to the CID, both on 12 June 1984 and 13 June 1984, is denied.

Later in the court-martial, the defense moved for reconsideration of the motion to suppress appellant's pretrial statements, and additional testimony was taken. Based on the additional evidence presented, the military judge entered the following supplemental findings of fact:

One, Private First Class Dock, while being processed by the German Polizei, asked if he would be able to obtain an American attorney to help him understand what was taking place if he remained in German custody;

Two, subsequent to that request he made another request for an American attorney to assist him in his dealings with the German authorities;

Three, when the accused made his request for an American attorney to help him in his dealings with the German authorities he was in German custody pursuant to an investigation being conducted at the behest of the German Criminal Polizei authorities in Butzbach, Germany;

Four, at no time on 12 June 1984 were the German Police authorities in Butzbach operating under the direction of the CID.

Again, these [findings of] facts are made in addition to the facts that I found at the last hearing of this trial on the issue of the accused's alleged statements to Agents Robinson and Bowen.