**UNITED STATES, Appellee**

v.

**Noel L. RAMOS, Specialist**
**U.S. Army, Appellant.**

No. 94–0494.
CMR No. 9202700.

U.S. Court of Appeals for
the Armed Forces.

Argued Feb. 15, 1995.

Decided Sept. 14, 1995.

For Appellant: *Captain James W. Friend* (argued); *Colonel Stephen D. Smith, Lieutenant Colonel James H. Weise, Major Fran W. Walterhouse, Captain Beth G. Pacella* (on brief).

For Appellee: *Captain Jinny Chun* (argued); *Colonel John M. Smith, Lieutenant Colonel James L. Pohl, Major Kenneth T. Grant, Captain John W. O'Brien* (on brief); *Captain Robert W. Clark.*

*Opinion of the Court*

WISS, Judge:

1. After a contested trial, a general court-martial convicted appellant of larceny, forgery, and larceny of mail matter (2 specifications each), in violation of Articles 121, 123, and 134, Uniform Code of Military Justice, 10 USC §§ 921, 923, and 934, respectively. Therefor, the court-martial sentenced appellant to a bad-conduct discharge, confinement for 6 months, a fine of $2,000.00, and reduction to the lowest enlisted grade. The convening authority approved these results, and the Court of Military Review * affirmed without opinion.

2. On appellant's petition, we granted review of his claim that the military judge "abandoned his impartial role and became an advocate for the Government." According to appellant, the military judge did so during the sentencing portion of the trial in two respects: In the manner of his questioning a defense witness named Staff Sergeant (SSG)

Knight during the sentence proceedings; and in his instruction to the members *sua sponte* to disregard a particular part of SSG Knight's testimony—the latter compounded by the judge's failure to intercede during trial counsel's allegedly improper argument relating to the same subject matter. Final Brief at 2–6. Now, we are satisfied that no prejudicial error tainted appellant's sentence.

I

3. Before SSG Knight testified, two other noncommissioned officers took the stand to attest to appellant's rehabilitation potential. The first was Sergeant First Class (SFC) Schick, appellant's section leader. SFC Schick had known appellant on both a personal and professional level for 4 years prior to the trial and believed that appellant was "[t]he best you can have" as a soldier. In part relevant to this appeal, he testified that he would "still trust" appellant and would "still take him back to work for" him, even knowing of these convictions.

4. SFC Townsend, also a long-time personal and professional associate of appellant, was in the supervisory chain over appellant and saw him daily. He testified that, until this court-martial, appellant "was a soldier that had unlimited potential for advancement and retainability in the military...." Indeed, throughout the pendency of the lengthy investigation that culminated in the court-martial, appellant's duty performance never changed for the worse. He had "total trust" in appellant and would "still take him back" in his unit, even in the face of the conviction.

5. That groundwork laid, we now turn to the testimony of SSG Knight. SSG Knight was appellant's first-line supervisor and had known him almost two years. He testified that appellant was "everything you could hope for in a soldier. He's honest, loyal, trustworthy.... He's just as close to as perfect a soldier as you can get, basically." Like SFC Schick and SFC Townsend before him, SSG Knight said there was "no doubt in my mind" that appellant still was "a good soldier" and that he would take appellant

---

* *See* 41 MJ 213, 229 n. * (1994).

back into his unit to work for him, even knowing of the convictions. Indeed, SSG Knight said that he "trust[ed appellant] so much that if he has to go to Mannheim [to confinement] I could hand him the keys, and he would drive there himself. That's how much I trust him."

6. Although the prosecution had declined to cross-examine the first two defense witnesses, trial counsel did cross-examine SSG Knight. Counsel asked a number of questions apparently designed to elicit an admission from the witness that, if he trusted appellant so much, he must not know him very well in light of the convictions. The colloquy continued:

Q. Well, you said you trusted him, is that correct?

A. Yes, sir.

Q. And you don't really believe that he could [d]o something like that, is that correct?

A. Yes, sir.

Q. But yet he did do these things?

A. Not to put anybody down, but in my mind he didn't do it.

Q. So, you can't accept the truth then that he is in fact guilty of these charges and specifications?

A. No, sir.

7. Seeking to mitigate the damage from this apparent flaunting of the members' guilty findings, defense counsel conducted the following redirect examination:

Q. Sergeant Knight, let me—let me ask you and see if you can answer a hypothetical question for me. You've known Ramos for a long time?

A. Yes, sir.

Q. And you have an opinion as to his value as a soldier, and you know he's been convicted of the thefts?

A. Yes, sir.

Q. If you believed he were guilty of the offense, would you still want him back in your unit?

A. Yes, I would, sir.

Q. You still think he has rehabilitative potential?

A. Yes, sir.

8. Thereafter, trial counsel picked up the gauntlet and recross-examined SSG Knight as follows:

Q. Let me see if I can get this straight. Hypothetically, you're saying that if you believe that he was guilty you would still want him to work in the mail room?

A. Well, if—if I thought he was guilty no, I wouldn't want him to work in the mail room.

Q. But the fact of the matter is, you don't accept that he's guilty, do you?

A. No, sir.

Q. And so you would still entrust him with valuable or sensitive items?

A. Yes, sir.

\* \* \*

Q. And you would entrust other people's property into his care knowing that he has been convicted of larceny?

A. Yes, I would, sir.

9. Himself apparently a bit mystified by SSG Knight's testimony, the military judge questioned the witness thusly:

Q. What kind of person do you think it would take to take checks from another soldier and then forge the signature of that person, and go from not just one installation here, but then to travel to distant installations with forged documents and cash these checks?

A. I think it's a corrupt individual.

Q. It's not a good indication of a soldier to you?

A. No, it isn't, sir.

Q. You're not trying to impugn the decision of this court as to his guilt or innocence, are you?

A. No, sir.

Q. You just haven't heard all the evidence in the case, and you're just making your testimony based on your loyalty to him and what you've known of him in the past, is that correct?

A. And his loyalty to me, sir.

MJ: Fine, I'm sure the members appreciate that.

10. Unable to resist the temptation to rejoin, defense counsel asked if he could clear

up "some confusion here"; to do so, he asked SSG Knight the following question, and the witness answered as indicated:

Q. What—regardless of how you feel, if you believe Specialist Ramos to be guilty, do you believe that even so, and he can perform the type of crime prescribed by the military that that kind of person with the basic character and track record as Specialist Ramos does that he could rehabilitate himself and continue to serve and contribute to the United States Army?

A. Yes, sir, very much so.

11. When the witness was excused at last, the military judge impromptu admonished the members in these terms, without defense objection:

MJ: Now the statement—the testimony by the witness that he thinks he can still be a soldier in the Army should really be disregarded by the court members because of the danger that you would perceive a punitive discharge as being an elimination type proceedings. That's not the purpose of a punitive discharge. And rehabilitation and rehabilitative potential should be reviewed by you in the broader sense, that is can the individual learn from his mistake and be rehabilitated to return as a productive citizen, whether that be in the military or civilian world. And one of the dangers that this court and the appellate courts are concerned with is that you will view a punitive discharge as something along the line, "Well, if he can't be a good—if we don't want him in the service then we will give him a punitive discharge." And that's not the purpose of it; it's to be deemed by you to be the appropriate punishment for the offenses not to—as a means of eliminating a person from the service.

12. Ironically, in light of all this effort by defense counsel to convince the members of appellant's continued worth to the Army, appellant's wife gave the following testimony even prior to the testimony of the three noncommissioned officers just discussed:

Q. What impact would it have on your family were [appellant] put in confinement?

A. It's going to be hard for me and the children, because we need him for emotional and financial support.

Q. Is there anything you'd like to tell the members of the panel?

A. Yes. Please don't take away my husband from my children.

Q. Is there anything else Mrs. Ramos?

A. Can you just please discharge him from the Army. It's hard enough to find a job in the civilian world. Please just take him out from the Army. We need him.

Consistently, appellant himself, in a subsequent unsworn statement to the members, wrapped up the defense sentencing case as follows:

I know that you're going to punish me. Punish me as appropriate, but please don't say I need jail, 'cause my family, my kids, they're not going to make it without me.

13. In due course, counsel then made their sentencing argument to the members. During his, trial counsel made these remarks:

You know Specialist Ramos does not belong in the mail room. He doesn't belong in the Army. He's violated that special trust and confidence we've placed in him. He doesn't deserve to be in the Army, what he did was just totally dishonorable.

A bit later, trial counsel again argued:

The accused must be dishonorably discharged from the Army for his deceitful, evasive, criminal activity. He has absolutely no rehabilitative potential.

Still later he went on to say:

I know that you will find that he should in fact be dishonorably discharged from the service, that he should in fact be confined for a long period of time, about 5 years, that he should pay a fine in excess of the amount of money he stole, and that he should be reduced to an E1. Members of the panel, do justice, find the accused should be discharged. Come back with a sentence of a dishonorable discharge, and 5-years' confinement, and a fine.

14. Defense counsel voiced no objection to any of these remarks, and, as implied in appellant's argument summarized at the out-

set of this opinion (¶2), the military judge did not interrupt to stop or to address it in any way. Ultimately, as indicated earlier, the members not surprisingly returned a sentence that included a punitive discharge, albeit bad-conduct, not dishonorable.

## II

■ 15. The parties agree, and so do we, that a military judge must not become an advocate for a party but must vigilantly remain impartial during the trial. This Court has commented on the tightrope over which a judge must tread in assuring, on the one hand, that court-martial members are provided the information that they need, while, on the other, "scrupulously avoiding even the slightest appearance of partiality." *United States v. Shackelford*, 2 MJ 17, 19 (CMA 1976); *see United States v. Dock*, 40 MJ 112 (CMA 1994); *United States v. Clower*, 23 USCMA 15, 48 CMR 307 (1974). As this Court said in *United States v. Loving*, 41 MJ 213, 253 ¶48 (1994):

> Because "jurors are ever watchful of the words that fall from him," a military judge must be circumspect in what he says to the parties and in how he examines witnesses. *United States v. Clower*, 23 USCMA 15, 18, 48 CMR 307, 310 (1974), *quoting Bollenbach v. United States*, 326 U.S. 607, 612, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946).

■ 16. That said, however, this Court has acknowledged that a military judge is not "a mere referee" but, rather, properly may participate actively in the proceedings. *See United States v. Graves*, 1 MJ 50, 53 (CMA 1975). Thus, while a military judge must maintain his fulcrum position of impartiality, the judge can and sometimes must ask questions in order to clear up uncertainties in the evidence or to develop the facts further. *See United States v. Dock, supra; United States v. Tolppa*, 25 MJ 352 (CMA 1987); *United States v. Reynolds*, 24 MJ 261 (CMA 1987).

■ 17. The legal test that flows from all this is whether, "taken as a whole in the context of this trial," a court-martial's "legality, fairness, and impartiality" were put into doubt by the military judge's questions. *United States v. Reynolds, supra* at 265.

This test is applied from the viewpoint of the reasonable person. S. Childress & M. Davis, 2 *Federal Standards of Review* § 12.05 at 12–38 (2d ed. 1992). No such doubt exists here. SSG Knight's testimony in certain respects was confusing and inconsistent; and the military judge properly questioned the witness in an effort to resolve the confusion, reconcile the inconsistency, and make clear for the members exactly what was the basis or bases of his opinion of appellant's rehabilitative potential. *See generally United States v. Ohrt*, 28 MJ 301, 304 (CMA 1989) ("Thus, a foundation must be laid to demonstrate that the witness does possess sufficient information and knowledge about the accused—his character, his performance of duty as a servicemember, his moral fiber, and his determination to be rehabilitated—to give a 'rationally based' opinion" as to rehabilitative potential.).

■ 18. Regarding the military judge's *sua sponte* instruction to the members to disregard SSG Knight's testimony "that he thinks [appellant] can still be a soldier in the Army," ¶11, it does not seem entirely unreasonable that the military judge viewed such testimony as out of bounds. SSG Knight had voiced an opinion that Ramos "could rehabilitate himself and continue to serve and contribute to the United States Army." In *United States v. Ohrt, supra* at 305, this Court recognized that "use of euphemisms, such as 'No potential for continued service'; 'He should be separated'; or the like are just other ways of saying, 'Give the accused a punitive discharge.'" The mirror image might reasonably be that an opinion that an accused could "continue to serve and contribute to the United States Army" simply is a euphemism for, "I do not believe you should give him a punitive discharge." If so, then such testimony would seem to be what the *Ohrt* Court had in mind when it explicitly stated that "a witness—*be he for the prosecution or the defense*—should not be allowed to express an opinion whether an accused should be punitively discharged." *Id.* at 304–05.

19. In any event, even if the military judge erred in drawing this conclusion, his instruction surely did not prejudice appellant's sentence. Three noncommissioned officers who were or had been appellant's supervisors and personal associates gave strong testimony that their trust in his honesty and integrity was unshaken by this court-martial conviction and that they would accept him back in their unit, notwithstanding the conviction. Appellant's perceived top-notch soldiering ability was made known to the members clearly and emphatically. Further, SSG Knight's opinion that appellant "could rehabilitate himself" was undisturbed by the military judge's instruction. In this context, the judge's admonition to disregard SSG Knight's opinion that appellant could "continue to serve and contribute to the United States Army" realistically could have had no impact on the ultimate sentence.

20. As for the supposed aggravation of this arguable misstep perceived by the military judge's failure to interrupt trial counsel's argument, three things may be said in quickly disposing of this suggestion. First, it was fully proper for trial counsel to argue that appellant's crimes appropriately should be punished by a dishonorable discharge. *See* RCM 1001(g), Manual for Courts–Martial, United States, 1984. Second, defense counsel's failure to object to the argument waived any appellate complaint to the contrary, *id.*—at least, absent plain error which clearly did not occur. Finally, we cannot help but notice that, in fact, trial counsel's frank effort to cultivate a severe sentence did not bear fruit: Appellant received neither the dishonorable discharge (a bad-conduct discharge was returned) nor confinement anywhere near the 5 years the prosecution requested (he received 6 months).

## III

The decision of the United States Army Court of Military Review is affirmed.

Chief Judge SULLIVAN and Judges COX, CRAWFORD, and GIERKE concur.