UNITED STATES, Appellee

v.

Richard C. FOSTER, Personnelman First Class
U.S. Navy, Appellant

No. 06-0238

Crim. App. No. 200301262

United States Court of Appeals for the Armed Forces

Argued October 25, 2006

Decided January 30, 2007

ERDMANN, J., delivered the opinion of the court, in which
EFFRON, C.J., and BAKER, J., joined.

STUCKY and RYAN, JJ., did not participate.

Counsel

For Appellant:  William E. Cassara, Esq. (argued); Captain
Jeffrey S. Stephens, USMC, and Captain Peter Griesch, USMC (on
brief).

For Appellee:  Major Kevin C. Harris, USMC (argued); Commander
Paul LeBlanc, JAGC, USN (on brief); Colonel Ralph F. Miller,
USMC.

Military Judge:  Nels H. Kelstrom


**This opinion is subject to revision before final publication.**

United States v. Foster, No. 06-0238/NA

Judge ERDMANN delivered the opinion of the court.

Personnelman First Class Richard C. Foster entered a plea of not guilty to two specifications of committing indecent acts with a child on divers occasions and one specification of communicating a threat, all in violation of Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934 (2000). At the close of the Government's case, the military judge dismissed one of the indecent act specifications on the grounds that the evidence was factually insufficient. The panel convicted Foster of the remaining two specifications and sentenced him to a dishonorable discharge, forfeiture of all pay and allowances, reduction to the lowest enlisted grade and confinement for five years. The convening authority approved the sentence and the United States Navy-Marine Corps Court of Criminal Appeals affirmed the findings and the sentence. United States v. Foster, No. NMCCA 200301262, 2005 CCA LEXIS 322, 2005 WL 2704961 (N-M. Ct. Crim. App. Oct. 18, 2005) (unpublished).

A military judge's impartiality is crucial to the conduct of a legal and fair court-martial. United States v. Quintanilla, 56 M.J. 37, 43 (C.A.A.F. 2001). The military judge may participate actively in proceedings to assure that court-martial members receive the information that they need to determine whether the accused is proven guilty, however, the military judge must take care not to become an advocate for

2

either party.  United States v. Ramos, 42 M.J. 392, 396 (C.A.A.F. 1995).  We granted review of this case to determine whether the military judge remained impartial in his conduct of this trial.[1]  While we do not condone some of the actions taken by the military judge, in the context of the entire trial, the legality, fairness, and impartiality of the court-martial were not put in doubt.

## Background

The allegations leading to Foster's charges involved several instances of inappropriate sexual contact with his six-year-old stepdaughter and his threats to her if she told her mother about the incidents.  The Government's case relied in large part on the stepdaughter's testimony and Foster's defense was that the child's story was not true.  A key component of the defense strategy was the testimony of Dr. Mary L. Huffman, a developmental research psychologist with expertise in evaluating children's testimony.

Foster's claim that the military judge was not impartial centers on the military judge's treatment of Dr. Huffman.

_____

[1] We granted review of the following issue:

> WHETHER THE NAVY-MARINE CORPS COURT OF CRIMINAL
> APPEALS ERRED TO THE SUBSTANTIAL PREJUDICE OF
> APPELLANT WHEN IT RULED THAT THE MILITARY JUDGE DID
> NOT BECOME A PARTISAN ADVOCATE FOR THE GOVERNMENT, AND
> THAT THE MILITARY JUDGE'S TREATMENT OF THE DEFENSE
> EXPERT DID NOT DENY APPELLANT'S RIGHT TO PRESENT A
> DEFENSE.

United States v. Foster, No. 06-0238/NA

Foster argues that the military judge harbored an inflexible and biased attitude toward Dr. Huffman and displayed contempt for her credentials and testimony and disdain for her area of expertise. He argues that the military judge improperly limited Dr. Huffman's testimony, engaged in hostile and combative questioning, and discredited her testimony by inaccurately summarizing it in a jury instruction that was not sufficiently detailed or accurate. Foster contends that the military judge, through his treatment of this expert witness, became a partisan advocate for the Government and denied him his right to present a defense. The Government responds that the military judge did not depart from his neutral role but set appropriate parameters on the testimony of the expert, asked questions to uncover relevant facts, and tailored the expert witness instructions to give accurate and impartial guidance to the members.

## Discussion

There is a strong presumption that a military judge is impartial in the conduct of judicial proceedings. Quintanilla, 56 M.J. at 44. "When a military judge's impartiality is challenged on appeal, the test is whether, taken as a whole in the context of [the] trial, [the] court-martial's legality, fairness, and impartiality were put into doubt by the military judge's actions." Id. at 78 (citation and quotation marks omitted); see also United States v. Acosta, 49 M.J. 14, 18

4

United States v. Foster, No. 06-0238/NA

(C.A.A.F. 1998). We apply this test from the viewpoint of the reasonable person observing the proceedings. Ramos, 42 M.J. at 396. Failure to object at trial to alleged partisan action on the part of a military judge may present an inference that the defense believed that the military judge remained impartial. See United States v. Burton, 52 M.J. 223, 226 (C.A.A.F. 2000) (citing United States v. Hill, 45 M.J. 245, 249 (C.A.A.F. 1996)).

We will address in turn each of the four alleged instances of partisanship that Foster has raised: (1) the military judge's improper limitation on Dr. Huffman's testimony; (2) the military judge's hostile examination of Dr. Huffman in front of the court-martial members; (3) the instruction to members which failed to identify Dr. Huffman as an expert and inaccurately summarized her testimony; and (4) inappropriate comments made by the military judge outside the presence of the members that demonstrated his bias against Dr. Huffman.

1. Limitation of Dr. Huffman's testimony

The defense's pretrial proffer of Dr. Huffman's testimony reflects that she was being called to "testify about the effects of multiple interviews on a child, leading questions, and improper interview techniques. She will testify these factors can taint a child's testimony and make the child actually believe something is true that is not."

5

A key aspect of Dr. Huffman's work involves the concept of source misattribution error where a child over time has difficulty discerning whether his or her own memory or another's repeated questioning is the real source of the information. In Dr. Huffman's view, an analysis of the first interview with the child is crucial in determining whether source misattribution error occurred. The first interview in this case was unavailable for review because the audio and videotape equipment failed. Due to the absence of this record, Dr. Huffman was unable to perform the source misattribution error analysis. As the defense was questioning Dr. Huffman about the interview procedures that were utilized in this case, the Government objected on the grounds that it appeared she was about to opine on the victim's credibility.

The military judge convened an Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2000), session outside the presence of the court-martial members to discuss the objection and Dr. Huffman's testimony. The military judge instructed Dr. Huffman that she could not reveal whether she thought the victim was telling the truth. Dr. Huffman was expressly prohibited from stating that "no one really could get on the stand and say that [the victim] is or isn't telling the truth." The rest of Dr. Huffman's examination, as well as the cross-examination, redirect

examination and re-cross examination proceeded without further objection or limitation.

Foster, relying on our decision in United States v. Cacy, 43 M.J. 214 (C.A.A.F. 1995), asserts that this testimonial limitation deprived him of a critical component of his defense and urges us to see this restriction as evidence of the military judge's bias against Dr. Huffman.  In Cacy, we recognized that an expert may testify about symptoms that are generally found among children who have suffered sexual abuse and whether the child-witness has exhibited these symptoms.  Id. at 217.  An expert may also testify about patterns of consistency generally found in the stories of victims as compared to patterns in the victim's story.  Id.  Although Cacy allows this type of expert testimony in appropriate circumstances, this court has recognized that there is a fine line between admissible testimony in this area and testimony about a victim's credibility or its functional equivalent, which is not admissible.  See id. at 217-18; United States v. Birdsall, 47 M.J. 404, 410 (C.A.A.F. 1998); United States v. Arruza, 26 M.J. 234, 237 (C.M.A. 1988); see also United States v. Brooks __ M.J. ___ (11)(C.A.A.F. 2007).

In this case, Dr. Huffman had no basis upon which she could offer a Cacy-like comparison of typical behavior patterns. Repeatedly during her testimony, she made the point that unless

a recording of the first interview was available for review, she would not have the means to assess whether the testimony of the victim was affected by multiple interviews. Since there was no record of the initial interview, Dr. Huffman lacked the case-specific information that she needed to make Cacy-type comparisons. Indeed, she stated expressly that "I don't think anyone can say that there was [source misattribution error] and I don't think anyone can say that there was not." Cacy is therefore inapplicable to this case.

The military judge ruled that while credibility assessments are a function of the jury, Dr. Huffman could help the members decide what factors they should use to carry out that function. What she could not do was reveal her personal assessment of the child's credibility. The limitation on her testimony was appropriate and the ruling of the military judge was not erroneous. As we have found that the military judge did not err in his testimonial limitation, there exists no basis upon which a reasonable observer could conclude that the ruling casts doubt upon the court-martial's legality, fairness, and impartiality.

2. The military judge's examination of Dr. Huffman

Following the examination of Dr. Huffman by the counsel for both parties, a member submitted several questions concerning Dr. Huffman's review of the case and the concept of source misattribution error. Based on these questions, the military

judge conducted an examination of Dr. Huffman.  The relevant

portion of this exchange is as follows:

    Q:  Have you ever interviewed [the victim]?

    A:  I have not.

    Q:  All right.  I'm sure it wasn't your intent to gloss
    over this, but it was kind of glossed over early on in your
    testimony.  I think they were just kind of rushing through
    to get to the crux of your testimony, but I understood you
    to say that in preparation for your testimony here today,
    you reviewed some paperwork but you were primarily
    interested in the number of times the children were
    interviewed, something along those lines.  Tell me if you
    will what it is that you reviewed about this case before
    coming in to testify?

    A.  What I typically review would be a videotape ----

    Q.  No, what have you reviewed in this case?

    A.  In this case.  I was not -- there was no documentation
    given to me from the forensic interviewer -- interview that
    was conducted with [the victim] or [the victim's brother].
    That information was lost so, therefore, I was sent police
    reports and different things like that, but I -- honestly,
    I did not even look at that because I'm mostly interested
    in the forensic interview and there was no documentation on
    that.  So what I asked for was a list of documented
    interviews and who conducted them.  So that's mostly what I
    reviewed.

    Q:  All right.  So you had a list of the people involved in
    conducting interviews?

    A.  Right.

    Q.  Okay.  But you did not review the police report or
    anything else that had been submitted to you?

    A.  That is correct.  I did not review those.

    Q.  So you, therefore, do not know what was contained
    within the police report?

9

A. Right. Because to me, the time delay between when that interview was conducted and what was actually contained -- what was contained in the report, there's such a delay that even the interviewer could reconstruct how they asked questions, what was asked, what was said, but that wasn't of value to me.

Q. It wasn't, okay. On cross-examination you did indicate that if a child tells the same story over time, notwithstanding a number of interviews, intervening interviews, that that is not a suggestive interview. None of those interviews would be suggestive, in your opinion.

A. That is correct. But the caveat needs to be said that in that first interview, leading -- which we don't have documentation on, leading questions, misleading questions, that the child could get clear messages as far as details and what needs to be said, and that that could be false information that's then maintained from interview to interview. And because I didn't have that first interview, again, I can't say, "Here are the original things and here's how they were carried through."

Q. Sure. Would it be important to you, for example, to talk to the person who conducted that first interview and determine the types of questions [which] were asked?

A. No, because they are reconstructing how an interview should be asked and what should -- and I believe most interviewers would know enough [to know that] you shouldn't ask leading questions, you should ask open-ended questions, but ----

Q. So you ----

A. ---- what actually happened is, we don't know.

Q. So, in other words, you wouldn't believe the person if that person told you that, "Gee, I asked non-leading questions."

A. As a memory expert, years down the road I don't know that they are going to reconstruct correctly because they've interviewed other people since then, and they don't have documentation from how that interview ----

10

Q.  So you just chose, instead, just to ignore the whole thing, not even inquire as to how that interview is conducted.

A.  I would look at it, but I would know that there are going to be memory errors incorporated because it wasn't conducted -- correctly done.

Q.  And that's why you didn't read the police report, that's why you didn't contact the person or persons who conducted these interviews.  Because you assumed there would be errors in how they would report to you how they conducted the interview?

A.  Legally and ethically, I never contact the people that conduct the interview.

Q.  So you got a list of names of people who conducted interviews with [the victim], you didn't speak with those people; all you have is names?

A.  Out of less ----

Q.  So you know the number of interviews, and a list of the people who conducted the interviews, and that's it?  With regard to the fact of the -- this case?

A.  That is correct, and then personal communication with defense counsel as far as other facts of the case and what was contained in those other things.

Q.  So you don't know, then, whether there was any source misattribution error at all in this case, do you?

A.  I don't think anyone can say that there was and I don't think anyone can say that there was not.

Q.  Okay.  Understand.  But you have no basis at all to state that that error that you identified is, in fact, an issue in this case.

A.  If a forensic interviewer is not careful enough to record the testimony ----

Q.  I understand that, but you don't know that.  You don't know that's so, in this case, you don't know if source attribution error is, in fact, an issue in this case?

A.   That we never could know whether it is or isn't.

Defense counsel did not object during the military judge's examination of Dr. Huffman.  However, outside the presence of the members he argued that the tone of the questioning might have led the members to think negatively about Dr. Huffman's preparation for trial or to believe that the military judge did not think highly of Dr. Huffman or feel that her opinion was valid.  Defense counsel described the questioning as harsh and combative and broached the possibility of submitting a proposed instruction that specifically addressed the exchange.

Although the military judge denied that his questioning was harsh and combative, he referenced a generic instruction that he intended to give requiring the members to disregard any of his comments or questions that they thought expressed an opinion about the credibility of a witness or about any issue in the case.  The matter of a unique instruction on the nature of the questioning was not raised again and the generic instruction was given with the final instructions.

On appeal, Foster describes the military judge's questioning of Dr. Huffman as "hostile," "combative" and "scathing" and contends that the military judge improperly took on the tone and tenor of a prosecutor.  The Government argues that the military judge was acting to ensure that the members had the information they required to assess the nature and value

of Dr. Huffman's testimony.  Noting that the defense did not object to the questioning at trial, the Government also argues that the military judge diminished the potential for bias through two curative instructions:  one of which addressed the proper use of expert testimony and the other which directed the members to ignore any statements reflecting any personal opinion or bias by the military judge.

A military judge "can and sometimes must ask questions in order to clear up uncertainties in the evidence or to develop the facts further."  Ramos, 42 M.J. at 396.  Because "jurors are ever watchful of the words that fall from him," however, "a military judge must be circumspect in what he says to the parties and in how he examines witnesses."  Id. (citation and quotation marks omitted).  In this regard, the tenor used by the military judge in questioning Dr. Huffman generates concern. Military judges should take care to elicit information in a neutral manner and to avoid the kind of approach reflected in this record that so closely resembles the tenor of cross-examination.  See United States v. Clower, 23 C.M.A. 15, 18, 48 C.M.R. 307, 310 (1974).  Nevertheless, judging from the standpoint of a reasonable observer, we have no difficulty concluding that "taken as a whole in the context of this trial," this limited exchange cast no doubt upon the court-martial's

legality, fairness, and impartiality.  Ramos, 42 M.J. at 396

(citation and quotation marks omitted).

    3.  The expert witness instruction

    Foster argues that the military judge's expert witness

instruction failed to identify Dr. Huffman as an "expert" and

also failed to accurately summarize her testimony.  From the

trial's outset, the military judge informed both counsel that he

would not refer to any of the expert witnesses as "experts."  He

explained that he "[did not] like to use the word 'expert'"

because he thought "that puts kind of an imprimatur on the

weight to be given to their testimony."  There was no objection.

    The military judge later gave instructions to the members

that described the testimony of the defense's two experts, Dr.

Huffman, a developmental research psychologist, and Lieutenant

Commander Steven A. Talmadge Jr., a forensic psychologist, as

"educational testimony."  The testimony of the Government's

expert witness, Dr. Elizabeth Heidt Kozisek, a clinical

psychologist, was described as "specialized testimony."  As to

Dr. Huffman, the instruction, in relevant part, read as follows:

> You have also heard the testimony of Dr. Mary Huffman
> and Lieutenant Commander Steven Talmadge who were
> allowed to testify in this case because their
> knowledge, skill, training, education and experience
> in their respective fields may assist you in
> understanding the evidence or in determining a fact in
> issue; however, you are not required to accept their
> testimony or give it more weight than the testimony of
> any other witness.  You should, however, consider

their qualifications in determining the weight you will accord their testimony.

. . . .

You will recall that Dr. Huffman did not testify about the nature of the pretrial interviews of [the victim] and [the victim's brother] that were conducted by various individuals in this case, nor about the types of questions that were used in conducting those interviews. Dr. Huffman did testify that because the videotape recording of a forensic interview of [the victim] by Special Agent Dillard had a blank audio track she was unable to perform an assessment of the types of questions asked during that interview. However, she did provide general information that suggestibility can cause memory errors, that every child is different in this regard with some children being more susceptible to suggestion than others, that age is a factor regarding the degree to which children are susceptible to suggestion, and that the type of questions employed during the interview process is significant in achieving a reliable result.

Dr. Huffman's testimony was permitted solely for its educational value to provide general information about children's memory in the courtroom due to repeated interviews and the effects of suggestion on memory to assist you in evaluating the evidence and determining the facts.

. . . .

Using the general educational information supplied by Lieutenant Commander Talmadge and Dr. Huffman, the specific information regarding the clinical evaluations of [the victim and her brother] supplied by Dr. Heidt-Kozisek, your own observations in court, your own experience in dealing with people, and all other factors I mentioned in determining witness credibility, it is your function to determine the credibility of the witnesses, the believability of their testimony and, ultimately, the facts of this case.

Before the military judge gave these instructions to the members, both counsel had the opportunity to review the

instructions.  Defense counsel did not object and in fact agreed that the military judge had summarized the specialized and educational testimony "fairly and accurately."  Government counsel objected to the instructions on several grounds but those objections were overruled by the military judge.[2] Government counsel then requested that the military judge instruct the members that they were not bound by his summaries. The military judge agreed and subsequently amended the Government's proposed version of that instruction as follows:

> Now, you are not bound by my summary above of the testimony provided by Dr. Heidt-Kozisek, Lieutenant Commander Talmadge and Dr. Huffman.  That summary is provided merely to assist you in understanding their testimony.  It is not evidence, and it is not intended to be a comprehensive summary of every question asked of these witnesses and their answers to those questions.  I again instruct you that you must base the determination of the issues in this case on the evidence as you remember it.

Foster argues on appeal that the military judge plainly erred by not giving a more detailed and accurate instruction. While Foster argues that the military judge committed plain error in regard to the expert witness instruction, he does not rely on that alleged error as a basis for reversal in and of

---

[2] The Government argued:  the summary of the Government's expert witness's testimony should not include a concession that she made in direct examination; Dr. Huffman's summary should be more specific so that it reflected several particular points that assisted the Government's case; and finally, the military judge should not use the summaries at all but rather employ the standard expert testimony instruction.

16

itself, but rather as further evidence of the military judge's partisanship. Under these circumstances we will evaluate the instruction under the test established in Quintanilla for those instances where a military judge's impartiality is challenged.[3] See also Acosta, 49 M.J. at 18.

Foster does not articulate exactly what the instruction should have said, but his complaint focuses on the military judge's characterization of Dr. Huffman's testimony as "general information," which Foster considers inferior to the military judge's characterization of the testimony of the Government witness as "specialized." Foster asserts that together with the military judge's examination of Dr. Huffman, the instruction essentially told the members that Dr. Huffman's testimony was worthless. The Government responds on appeal that the military judge's instructions were accurate.

Within certain bounds, military judges can comment upon and summarize evidence admitted in the form of expert witness testimony. Rule for Courts-Martial (R.C.M.) 920(e)(7) states that instructions on findings shall include "[s]uch other explanations, descriptions, or directions as may be necessary

---

[3] "When a military judge's impartiality is challenged on appeal, the test is whether, taken as a whole in the context of [the] trial, [the] court-martial's legality, fairness, and impartiality were put into doubt by the military judge's actions." United States v. Quintanilla, 56 M.J. 37, 78 (C.A.A.F. 2001).

and which are properly requested by a party or which the military judge determines, <u>sua sponte</u>, should be given."  In moving beyond benchbook instructions, however, military judges must use caution not to do so in a manner that either places undue emphasis on or minimizes the importance of expert testimony.[4]  Cf. <u>United States v. Washington</u>, 63 M.J. 418, 425 (C.A.A.F. 2006) ("A particular formula is not required in administering an oath or affirmation, although adherence to the benchbook formula will minimize dispute.").

Expert testimony is appropriate where "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue . . . ."  Military Rules of Evidence (M.R.E.) 702.  When an individual testifies under M.R.E. 702, it is precisely because the military judge has found that individual to hold the requisite qualifications of an expert.  The members are entitled to be informed of that designation and a military judge must not impose his or her own views to either diminish or enhance that important role.  We find that the military judge erred in failing to use the term "expert" and by substituting that term with the terms "specialized" and "educational."

---

[4] <u>See</u> Dep't of the Army, Pamphlet 27-9, Legal Services, <u>Military Judges' Benchbook</u> ch. 7, para. 7-9-1 (2002).

Although we find that the military judge erred in this regard, we do not believe that the instructions raise any reasonable doubt about the military judge's impartiality. See United States v. Cooper, 51 M.J. 247, 252 (C.A.A.F. 1999). While the military judge's instructions on expert testimony reflected his personal views as to the value of that testimony, his refusal to use the term "expert" applied equally to both parties' witnesses and we are not persuaded that the term "educational testimony" is critical of Dr. Huffman or prejudicial to Foster's defense. We conclude that Foster has failed to demonstrate that these unchallenged expert witness instructions affected the trial's legality, fairness or impartiality.

   4.   Comments made by the military judge outside the
   members' presence

Foster argues that comments made by the military judge during an Article 39(a), UCMJ, session further demonstrate his bias against Dr. Huffman. During this hearing, which was held outside the hearing of the members, the military judge made several intemperate statements concerning Dr. Huffman's experience, ego and the need to control her testimony. While the military judge's language was inappropriate we do not believe that this personal expression of irritation impacted Foster's right to a fair trial in light of the fact that the comments were not heard by the court-martial members. See United States v. Reynolds, 24 M.J. 261, 264 (C.M.A. 1987)

19

United States v. Foster, No. 06-0238/NA

(upholding harsh comments used to exercise control over proceedings when given outside the presence of the court members).

## Conclusion

Foster has failed to present sufficient evidence to overcome the strong presumption of a military judge's impartiality.  Although the military judge's conduct at times departed from judicial propriety, a reasonable observer would conclude that in the context of the whole trial, his actions did not compromise the court-martial's legality, fairness, or impartiality.

## Decision

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is affirmed.