# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

## UNITED STATES

**v.**

## Airman First Class DAVID K. COOPER
## United States Air Force

## ACM 38293

## 9 July 2014

Sentence adjudged 9 November 2012 by GCM convened at Joint Base San Antonio-Lackland, Texas. Military Judge: Donald R. Eller, Jr.

Approved Sentence: Bad-conduct discharge, confinement for 45 days, and reduction to E-1.

Appellate Counsel for the Appellant: Major Matthew T. King and William E. Cassara (civilian counsel).

Appellate Counsel for the United States: Colonel Don M. Christensen; Major Roberto Ramírez; and Gerald R. Bruce, Esquire.

Before

ALLRED, HECKER, and SANTORO
Appellate Military Judges

OPINION OF THE COURT

This opinion is subject to editorial correction before final release.

SANTORO, Judge:

A general court-martial composed of officer members convicted the appellant, contrary to his plea, of one specification of wrongful sexual contact, in violation of Article 120, UCMJ, 10 U.S.C. § 920.[1] The adjudged and approved sentence consisted of

---

[1] The court-martial acquitted the appellant of aggravated sexual assault, abusive sexual contact, and a second specification of wrongful sexual contact, all in violation of Article 120, UCMJ, 10 U.S.C. § 920. The military judge dismissed two additional specifications alleging indecent acts based on the same conduct.

a bad-conduct discharge, confinement for 45 days, and reduction to E-1. Before us, the appellant asserts: (1) the evidence is legally and factually insufficient to sustain the finding of guilt, and (2) the military judge abandoned his neutral role by asking 38 questions not posed by the members. Finding no error, we affirm the findings and sentence.

*Background*

On 28 January 2012, Senior Airman (SrA) AF and her boyfriend, CF, hosted a party at their off-base residence. Among the attendees were the appellant, his wife, and the victim, Airman First Class (A1C) KB. The appellant and the victim worked in the Medical Operations Squadron and had seen each other occasionally, but they had not had any meaningful interaction prior to the night of the party. The victim was dating and planned to marry another Airman who was away on temporary duty at the time.

Among the activities at the party was "beer pong," a drinking game. The appellant and the victim were partners for one of the beer pong games and, while playing, exchanged "high fives." During the evening, the appellant brushed against the victim's backside several times, which the victim found odd. The victim also thought the appellant acted in a manner that was "overly friendly." The victim testified that, although she did not tell the appellant to stop brushing against her, she did not initiate any contact with him or say or do anything that would demonstrate any interest in him. During the course of the evening, the victim consumed approximately two beers.

Between approximately 0100 and 0200, the appellant and his wife left the party. The victim had planned to remain overnight at SrA AF's apartment, so she changed for bed and lay down on the living room couch, intending to sleep. The others continued playing beer pong but lowered the volume on the music.

The victim was awakened some time later when the appellant returned to the party without his wife. The appellant was "wasted"; he later told police he was so intoxicated that he had vomited. SrA AF, observing the appellant, told him he was too drunk to leave a second time.

The victim remained on the couch and began to fall asleep again. She was awakened by the appellant, also on the couch, sitting on her feet. She pushed them away and went back to sleep. She was awakened again by the appellant falling on top of her legs and scratching at her backside and lower back. The victim asked for help getting the appellant off of her; the others at the party attempted to help but were unsuccessful because the appellant kept passing out. He eventually ended up lying on the floor. While getting the appellant to the floor, CF told him not to get back on the couch because the victim was there and did not want him near her. The victim remained on the couch, as

the bedroom was occupied by others, and the victim perceived no threat from the now-passed-out appellant.

The victim next awoke feeling "pressure," like fingers, in her vagina. Her pants and underwear had been removed, and her blanket had been cast aside. She recognized the appellant and said, "Cooper, what the hell are you doing?" The appellant said, "I don't know what I'm doing here and the last thing I remember, I was at my house. Where am I?" The appellant then left the apartment.

The victim, hysterical, immediately called her boyfriend and tried to tell him what happened, but he could barely understand her. Her screams upon awakening also awoke SrA AF and CF. Both described her as distraught and emotional. The victim told them that she woke up, found her pants off, came to, realized what was going on, and told the appellant to stop. She said, "I'm not exactly sure what happened."

Detectives with the San Antonio Police Department were contacted and interviewed the appellant the day after the party. The appellant initially told police he never returned to the party after he and his wife left. He later amended his statement to say he did return to the party, did digitally penetrate the victim, but that he did so with her consent.

During his testimony at trial, the appellant said he believed the victim wanted him to digitally penetrate her because she had been giving him "high-fives" during beer pong, had been laughing with him, and occasionally brushed against him while they were playing. He testified that he returned to the party after leaving his wife home with the specific goal of "hooking up" with the victim. Although she was asleep when he began to remove her clothes, he testified that she moved her legs and back to facilitate their removal, which he took as a sign of her awakening and consenting.

*Factual and Legal Sufficiency*

The appellant asserts the evidence at trial was neither factually nor legally sufficient to prove abusive sexual contact. We review issues of factual and legal sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987), *quoted in United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000). In conducting this evaluation, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *Turner*, 25 M.J. at 324, *quoted in United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citing *United States v. Rogers*, 54 M.J. 244, 246 (C.A.A.F. 2000); *United States v. Blocker*, 32 M.J. 281, 284 (C.M.A. 1991)). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993).

The elements of wrongful sexual contact, as applied to this case, are:

(1) That at or near San Antonio, Texas, on or about 29 January 2012, the appellant engaged in sexual contact, to wit: penetrating the vagina of A1C KB, with his finger or fingers,

(2) That such sexual contact was without the permission of A1C KB, and

(3) That such sexual contact was wrongful.

*See Manual for Courts-Martial, United States* (*MCM*), A28-9, ¶ 45.b.(13) (2012 ed.).

The attack on the legal and factual sufficiency of the evidence is based on the appellant's assertion that he made an honest and reasonable mistake of fact in believing that the victim consented to his digitally penetrating her. An honest and reasonable mistake of fact as to consent has both subjective and objective components: the appellant must actually believe the victim consented, and that belief must be objectively reasonable (to a sober person) under the circumstances. *See MCM*, A28-5, ¶ 45.a.(t)(15). Once raised, the Government bears the burden of disproving mistake of fact beyond a reasonable doubt. *See MCM*, A28-5, ¶ 45.a.(t)(16).

We have reviewed and considered the entire record of trial. Although there are some minor inconsistencies concerning what various witnesses observed and whether the interactions between the appellant and the victim could be considered "flirtatious," the overwhelming weight of the evidence is that nothing the victim did or said could objectively be considered an indication that she wanted the appellant to penetrate her vagina with his fingers while she was asleep. Moreover, although the victim may have unconsciously moved her legs or back in response to the appellant's attempts to remove her clothes and touch her vagina, we find that no reasonable person would consider those actions to evince her consent under the circumstances. Finally, the implausibility of the appellant's statements on cross-examination, coupled with his admitted lies to the

San Antonio Police Department, convince us that the testimonies of the other partygoers regarding his interactions with the victim are more credible than his.

We have considered the evidence in the light most favorable to the prosecution. We have also made allowances for not having personally observed the witnesses. Having paid particular attention to the matters raised by the appellant, we find the evidence factually and legally sufficient to support his conviction for wrongful sexual contact.

*Questioning by the Military Judge*

The appellant next argues that, when the military judge questioned him, the military judge abandoned his neutral role. When a military judge's impartiality is questioned on appeal, we must determine whether, taken as a whole in the context of the trial, a reasonable person might question a court-martial's legality, fairness, and impartiality. *United States v. Ramos*, 42 M.J. 392, 396 (C.A.A.F. 1995). There is a strong presumption that a military judge is impartial in the conduct of judicial proceedings. *United States v. Quintanilla*, 56 M.J. 37, 44 (C.A.A.F. 2001). A party seeking to demonstrate bias must overcome a high hurdle, particularly when the alleged bias involves actions taken in conjunction with judicial proceedings. *Id.*

Moreover, a military judge may be an active participant in the proceedings but "must take care not to become an advocate for either party." *United States v. Foster*, 64 M.J. 331, 332–33 (C.A.A.F. 2007). The failure of trial defense counsel to object at trial to alleged partisan action by the military judge "may present an inference that the defense believed that the military judge remained impartial." *Id.* at 333.

A total of nine witnesses testified: eight for the prosecution and the appellant on his own behalf. The members submitted 12 questions: 2 to the victim, 2 to SrA AF, 1 to the DNA expert, and 7 to the appellant. In addition to the questions themselves, several of the members' question forms contained declarative statements to provide context to their questions.

The military judge conducted the examination on behalf of the court-martial. Rather than ask only the members' questions as written, the military judge often asked what could be considered foundational or contextual questions. An example from the victim's testimony is illustrative. During her testimony, one of the court members submitted the following two-part question: "How much alcohol did she consume that night? Anything other than just beer?" The military judge conducted the following examination:

> [MJ:] All right, [A1C KB], let me ask you this: How much alcohol do you
> think you consumed that night?

WIT: About two beers.

MJ: Throughout the entire course of the evening from the - you say you got to the party about 2100, is that right? About nine o'clock?

WIT: Yes.

MJ: Until you put your head on the pillow on the couch, do you know what time that was?

WIT: It was about two or three in the morning.

MJ: Okay. From 9 p.m. until two or three in the morning, you think you had two beers?

WIT: Yes.

MJ: Okay. Anything else to drink? Were you doing shots or any other hard liquor or anything like that?

WIT: No, I was drinking a lot of Dr[.] Pepper and I had a lot of water. I mean, I didn't go there to get completely trashed.

MJ: Okay. All right. So, over the course of that evening, two beers is what you think you had?

WIT: Yes.

MJ: Okay.

The following is illustrative of how the military judge handled the members' questions for the appellant. One member asked, "How much did you have to drink 28 & 29 Jan 2012? What time frame? What did you have to drink? Were you drunk?" The military judge then questioned the appellant:

MJ: Airman Cooper, were you drinking alcohol at this party?

ACC: Yes, sir.

MJ: About what time do you think you got to the party?

ACC: Around 9:30, sir.

MJ: What were you drinking?

ACC: It was Jose Cuervo margarita mix.

MJ: Is that all you drank?

ACC: Yes, sir.

MJ: You said you were playing beer pong?

ACC: Yes, sir.

MJ: Did you have to have any beer because of the game?

ACC: No, sir. I was drinking Jose Cuervo margarita mix in the cups as I do not drink beer.

MJ: Okay. How much do you think you had to drink?

ACC: Close to half of a fifth, sir.

MJ: How did you feel?

ACC: I felt drunk, not intoxicated. I didn't have any trouble walking or anything, sir.

MJ: Okay. You'll have to explain that a little bit for them, I think. You felt drunk but not intoxicated? Explain, then, what you were feeling.

ACC: Yes. I felt drunk as if, you know, not like falling down, obliterated as some people have seen, you know, other people walk out of bars or anything. I did feel drunk, though, as a little lightheaded; just a natural drunk, buzzed feeling.

MJ: You left the party at about what time?

ACC: Around 1:30/2:00, sir.

MJ: What time did you go back?

ACC: I'm sorry, sir. I left the party the first time around 12:30/1:00 and I went back close to 1:30/2:00.

MJ:    When you went back, did you have more to drink?

ACC:   I did not, sir.

MJ:    When you were sitting on the couch after the beer pong game, how were you feeling?

ACC:   At that point in time, I was sobering up as I didn't have anything to drink since before I left the party the first time.

There were, however, two occasions on which the military judge asked questions not directly related to a member's question. For example, during the testimony of CF, a prosecution witness, at the conclusion of direct and cross-examination, and before asking whether the members had any questions, the military judge inquired:

Q:    Mr. [CF], let me just ask you this question. This is a matter of clarification. When you left the living room to go smoke a cigarette before you went to bed, did you actually see [the appellant] on the floor or was he still on the couch when you left the room?

A:    He was still on the couch when I left, sir.

Q:    All right. But you had told him to get on the floor?

A:    Yes, sir.

Q:    All right. And when you finally got up and was [sic] able to put on some shorts and go out into the living room area, where was [the victim]? Was she on the couch, was she standing up, was she in the kitchen?

A:    She was on the couch in the living room.

Q:    Okay. Let me further that point. You indicated that at some point, you actually talked to [the victim's boyfriend] on the phone. Is that right?

A:    Yes, sir.

Q:    How was it that he was on the phone, and who - - first off, let me ask you this: Whose phone was he on?

A:    He was on - -

Q:      If you know.

A:      I would like to say - - I don't know for sure, sir.

Q:      Okay. That's fine, that's fine. Do you know how he ended up on the phone? Did somebody call him while you were standing there talking, or was he already - - was the phone open or do you know what happened?

A:      He was called.

Q:      Okay; while you were in the living room or was he already on the phone?

A:      He was called after everything was explained in bits and pieces from [the victim] while she was frantic and disheveled.

Q:      Okay. Do you know how that came about? Did you suggest that she call [her boyfriend]? Did she say it? Do you recall how that came about?

A:      No, I do not, sir. I just know that I spoke with him on the phone and he told me the steps to deal with what had just happened because I have never actually encountered the situation before.

During the appellant's testimony, after the military judge posed the member's questions about the appellant's level of sobriety and what he had been drinking (excerpted above), the military judge continued with this inquiry:

MJ:    You indicated that at one point, you were sitting on the couch and then somehow you were slumped over the side of the couch, is that right?

ACC:  When I was sitting on the couch, I began to fall asleep, and after I had fallen asleep, when I woke up, instead of sitting straight up, I was leaned towards the opposite side of the couch.

MJ:    When you say the opposite side of the couch - -

ACC:  Away from [the victim], sir.

MJ: Okay. Do you recall anybody talking to you telling you to move from one side to the other on the couch?

ACC: I do not, sir.

MJ: You indicated that at some point, you moved from the couch to the floor, is that right?

ACC: Yes, sir.

MJ: Did somebody tell you to get on the floor or what happened there?

ACC: No, sir. When I had woken up and I was leaning on that side of the couch, they were finishing moving the beer pong table and cleaning up in the kitchen. At that point in time, I just scooted down to the floor with my back against the couch.

MJ: But nobody told you to get on the floor?

ACC: No, sir.

MJ: And you didn't lay down? You said you had your back against the couch?

ACC: Yes, sir.

MJ: Why did you move to the floor?

ACC: Just when I was sitting there, sir, and they were just all cleaning up, I had just moved down to the floor; no specific reason as to why I moved down to the floor.

Trial defense counsel did not object to any of the military judge's questions.

In his instructions to the members before deliberation, the military judge advised them it was their duty to determine the believability of the witnesses and they must disregard any judicial comment or statement that might indicate the military judge's view of the evidence. The members are presumed to have followed the military judge's instruction. *United States v. Reyes*, 63 M.J. 265, 267 (C.A.A.F. 2006) (citations omitted).

The military judge neither singled out the appellant for questioning nor did his questioning of appellant differ from the manner in which he questioned the prosecution witnesses. His questions were open-ended and non-suggestive. While it is true that other

judges may not have conducted such questioning when not sitting as the finder of fact, the law does not compel the military judge to be the proverbial potted plant.

After a full review of the record, we find the military judge maintained his "fulcrum position of impartiality" and his questioning of the witnesses, including the appellant, "did not suggest any judicial preference or belief." *United States v. Acosta*, 49 M.J. 14, 18 (C.A.A.F. 1998). We are satisfied that a reasonable person viewing the trial would not have had doubt about its fairness. The appellant therefore has failed to meet his high hurdle to show the military judge abandoned his role as an impartial arbiter, and we reject this assignment of error.

## *Conclusion*

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of the appellant occurred.[2] Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and the sentence are

AFFIRMED.

FOR THE COURT

LEAH M. CALAHAN
Deputy Clerk of the Court

---

[2] The Court-Martial Order (CMO), dated 26 February 2013, includes the words "and that such sexual contact was" in Specifications 3 and 4 of the Charge. This language does not appear on the charge sheet. We direct the completion of a corrected CMO.