*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps Court of Criminal Appeals

Before
CRISFIELD, GASTON, and STEWART
Appellate Military Judges

_____

**UNITED STATES**
Appellee

**v.**

**Tomas ROCHA, Jr.**
Lance Corporal (E-3), U.S. Marine Corps
Appellant

**No. 201900078**

Decided: 17 September 2020

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges:
Mark D. Sameit (arraignment)
Peter A. McNeilly (trial)

Sentence adjudged 8 November 2018 by a general court-martial convened at Marine Corps Base Camp Pendleton, California, consisting of a military judge sitting alone. Sentence approved by the convening authority: reduction to E-1, confinement for 18 months, forfeiture of all pay and allowances, and a bad-conduct discharge.

For Appellant:
*Lieutenant Commander Jeremy J. Wall, JAGC, USN*

For Appellee:
*Lieutenant Commander Timothy C. Ceder, JAGC, USN*
*Lieutenant Jennifer Joseph, JAGC, USN*

Judge STEWART delivered the opinion of the Court, in which Chief Judge Emeritus CRISFIELD and Senior Judge GASTON joined.

_____

**This opinion does not serve as binding precedent, but
may be cited as persuasive authority under
NMCCA Rule of Appellate Procedure 30.2.**

_____

STEWART, Judge:

Appellant was convicted, contrary to his pleas, of one specification of dereliction of duty, two specifications of sexual assault, and one specification of indecent viewing, in violation of Articles 92, 120, and 120c, Uniform Code of Military Justice [UCMJ], 10 U.S.C. §§ 892, 920, and 920c (2012 & Supp. IV 2017), for willfully failing to perform his duties as a gate sentry onboard Camp Pendleton, for touching the breast of the victim, Ms. White,[1] by causing bodily harm and by placing her in fear of being fined $1,000, and for indecently viewing Ms. White's breasts as she attempted to come onboard Camp Pendleton.[2]

Appellant asserts three assignments of error [AOEs], renumbered as follows: (1) the military judge abandoned his role as an impartial participant in the court-martial by assisting the Government in establishing proof of an element of an offense;[3] (2) the evidence is legally and factually insufficient to sustain Appellant's conviction under Article 120c, UCMJ; and (3) the results of trial are inaccurate in characterizing Appellant's conviction for Article 120c, UCMJ, as a sexual assault. We find no prejudicial error and affirm the findings and sentence. However, we order correction of the results of trial in our decretal paragraph.

_____

[1] All names in this opinion, other than those of the judges and counsel, are pseudonyms.

[2] The specification of sexual assault based on placing Ms. White in fear of being fined was conditionally dismissed without prejudice after findings, but before sentencing.

[3] This assignment of error is raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

## I. BACKGROUND

### A. Appellant Encounters Ms. White at San Onofre Gate

On a Sunday night, Appellant was on duty as a gate sentry with Corporal [Cpl] Papa at the San Onofre Gate at Camp Pendleton. While Cpl Papa was checking identification cards at the gate, Appellant performed an armed "overwatch."[4] At approximately 2300, Ms. White approached the San Onofre gate in a large sport utility vehicle on her way to her on-base home where she resided with her husband, Sergeant Lima.

At the gate, Ms. White encountered Cpl Papa and Appellant. Cpl Papa was positioned at Ms. White's driver's side window, while Appellant was positioned at the passenger's side. After Ms. White handed her identification card to Cpl Papa, she was directed to pull her vehicle over to a parking spot adjacent to the gate. Once there, she was directed by Appellant to park in a different location in the same parking lot. Ms. White testified that this second parking spot had no lighting, there were no other people or vehicles nearby, and the entrance gate was not visible from it.

Appellant approached Ms. White's vehicle and explained that her license plate light was out. Appellant told Ms. White that this vehicle infraction carried a fine of $1,000. Ms. White testified that after hearing the potential consequences for this infraction, she became nervous as she could not afford to pay such a fine. After she offered to get the light fixed, Appellant asked Ms. White, "[D]o you think there's anything you could do to get out of this?"[5] Appellant then suggested that Ms. White could avoid the purported $1,000 fine if she removed her top to expose her breasts to him.

Ms. White did so, testifying that Appellant's actions rendered her "shocked."[6] She explained that she did not want to expose herself to Appellant, and did so only to avoid the potential fine. She testified that Appellant saw her exposed breasts, and then squeezed her left breast for under 30 seconds. At that point, a Provost Marshal's Office [PMO] vehicle

---

[4] "Overwatch" is a term used to describe the role of a gate sentry whose responsibility is to ensure officer safety and to watch for obvious infractions associated with inbound vehicles.

[5] R. at 39.

[6] *Id.* at 40.

entered the parking lot, Ms. White replaced her shirt, and Appellant permitted her to depart the parking lot for her home.

Once home, Ms. White texted her best friend, Ms. London, "Dude, something f[***]en crazy happened. Call me. LOL."[7] When the two spoke over the phone, Ms. White relayed the details of her interaction with Appellant. She later testified that she was still in shock during this conversation. Ms. London corroborated this account and testified at trial that Ms. White appeared to her to be in shock and upset as a result of the experience. Ms. White disclosed portions of the incident to her husband the following morning.

**B. The Investigation**

Two days later, Ms. White returned to the San Onofre gate guard station searching for her dependent identification card, which had not been returned to her during her encounter with Appellant. She reported to a gate sentry that she had been "sexually harassed" and explained that she had been stopped for a vehicle infraction and told that "the only way out of that ticket is to lift [your] shirt."[8] She described having to park her vehicle twice, the second time at the direction of Appellant to a more hidden location in the parking lot adjacent to the guard house. Though the testimony calls into question precisely when, Ms. White mentioned to the sentry and a civilian PMO officer that she had also been "groped."[9] This report ultimately made its way to Marine Corps Criminal Investigation Division [CID], which conducted a photographic lineup at which Ms. White identified Appellant as the individual who had groped her. The matter was then referred to the Naval Criminal Investigative Service. Special Agent [SA] Juliet interviewed Ms. White, who corroborated details of the CID referral. Based on this information, SA Juliet interrogated Appellant.

Appellant made several admissions in his interrogation. He admitted lying to Ms. White by telling her that her vehicle infraction would result in a $1,000 fine. He admitted asking Ms. White if she would give him a "boob flash" in exchange for him looking the other way on the infraction.[10] He

---

[7] *Id.* at 51. Ms. White testified that she understood "LOL" to mean "laugh out loud," but that she used this vernacular in the majority of her text messages.

[8] *Id.* at 138.

[9] *Id.* at 145-46.

[10] Pros. Ex. 5.

admitted asking if he could touch Ms. White's breast after she exposed herself, and then doing so when she acquiesced. When asked by SA Juliet "why did you direct [Ms. White] from the spot that she was in to the spot that you had moved her to?"[11] Appellant replied: "the lighting, Sir."[12] SA Juliet followed up by asking "what about it?" to which Appellant replied: "there's, uh, no lighting."[13]

### C. Appellant's Court-Martial

At trial, the Government presented the testimony of Ms. White, and seven other witnesses to include Appellant's Battalion Trainer, who testified regarding the duties of gate sentries, their training, and the layout of the San Onofre gate. At several points in the course of receiving testimony, the military judge, sitting as the fact-finder, asked questions of his own. Of the eight witnesses who testified at Appellant's trial, the military judge asked questions of four of them. In total, he asked 14 questions of the witnesses, most of which were driven toward clarification of the witnesses' testimony. Only two questions seemed aimed more towards the elicitation of facts not brought out by the Government on direct examination. In following up on Ms. White's testimony that Appellant had viewed her breasts, the military judge asked: "did [Appellant] see your nipples?" to which Ms. White responded: "yes."[14] Later, during the testimony of Cpl Papa, the military judge asked: "when [Appellant] left the spot where he was standing over-watch, was he replaced by somebody else?" to which Cpl Papa replied: "no, he was not, sir. We were the only two Marines on that gate that night."[15]

Ultimately the military judge returned findings of guilty to all charges and specifications.

---

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] R. at 63.

[15] *Id.* at 85.

## II. DISCUSSION

### A. The Military Judge Did Not Abandon His Duty of Impartiality

*1. Standard of review*

We review issues of judicial impartiality where no objection is made at trial for plain error.[16] The plain error test asks whether (1) there is error, (2) whether that error is plain or obvious, and (3) whether any error resulted in material prejudice.[17] Because the issue here concerns Appellant's constitutional due process right to an impartial judge, the test for prejudice asks whether any error is harmless beyond a reasonable doubt.[18]

*2. The military judge may ask questions of witnesses*

"Military practice and procedure expressly provide for questioning of witnesses by a military judge."[19] The Rules for Courts-Martial [R.C.M.] and Military Rules of Evidence [Mil. R. Evid.] lay out the procedural rules for doing so. Rule for Courts-Martial 801(c) provides that "the court-martial may act to obtain evidence in addition to that presented by the parties."[20] The discussion to the rule adds that "the members or military judge may require that . . . a new witness be summoned, or other evidence produced."[21] In taking such action, the court-martial is limited by its duty not to depart from an "impartial role."[22] Military Rule of Evidence 614 likewise addresses the court-martial's ability to obtain evidence through the examination of witnesses. The rule provides that a military judge may "examine a witness regardless of who calls the witness."[23]

---

[16] *United States v. Martinez*, 70 M.J. 154, 157 (C.A.A.F. 2011).

[17] *United States v. Maynard*, 66 M.J. 242, 244 (C.A.A.F. 2008).

[18] *United States v. Tovarchavez*, 78 M.J. 458, 460 (C.A.A.F. 2019); *see also United States v. Cooper*, 51 M.J. 247, 250 (C.A.A.F. 1999) (an accused's right to an impartial judge stems from due process) (citations omitted).

[19] *Cooper*, 51 M.J. at 250.

[20] *See also* UCMJ art. 46.

[21] R.C.M. 801(c), Discussion.

[22] *Id.*

[23] Mil. R. Evid. 614.

Regarding military judges specifically, the Court of Appeals for the Armed Forces [C.A.A.F.] "has acknowledged" that the military judge "may participate actively in the proceedings . . . [and] sometimes must ask questions in order to clear up uncertainties in the evidence or to develop the facts further."[23] While military judges have "wide latitude" to examine witnesses, they are nevertheless limited by the duty of impartiality.[24] Military judges thus must walk a "tightrope" when examining witnesses, striving to avoid the "slightest appearance of partiality," while ensuring the fact-finders are provided the information they need.[25] In this case the military judge *was* the fact-finder, so there was no danger of improperly influencing members by his questions.

*3. The military judge's questions do not suggest he breached his duty of impartiality.*

"There is a strong presumption that a military judge is impartial in the conduct of judicial proceedings."[26] When a military judge's impartiality is challenged on appeal, we evaluate whether "taken as a whole in the context of the trial, the court-martial's legality, fairness, and impartiality were put into doubt by the military judge's actions."[27] "We apply this test from the viewpoint of the reasonable person observing the proceedings."[28] Where the defense fails to object at trial to a judge's alleged partiality, we may infer that the defense believed the military judge remained impartial.[29] Neither our rules nor case law preclude a military judge from eliciting evidence which may favor one party or another.[30]

Here, the military judge, sitting as the fact-finder in this judge-alone general court-martial, conducted questioning of the witnesses in a neutral

---

[23] *United States v. Ramos*, 42 M.J. 392, 396 (C.A.A.F. 1995) (citations omitted).

[24] *See Id.* ("a military judge must not become an advocate for a party but must vigilantly remain impartial during the trial.").

[25] *Id.*

[26] *United States v. Quintanilla*, 56 M.J. 37, 44 (C.A.A.F. 2001).

[27] *United States v. Foster*, 64 M.J. 331, 333 (C.A.A.F. 2007) (citation and internal quotation marks omitted).

[28] *Id.*

[29] *Id.*

[30] *United States v. Acosta*, 49 M.J. 14, 18 (C.A.A.F. 1998).

manner, with largely non-leading questions, and over no objection by counsel.[31] The two questions that Appellant finds most objectionable, while aimed at elements of the offense, were within the bounds of the rules. Those questions served to establish (1) that in viewing Ms. White's breasts, Appellant also viewed her nipple, and (2) Appellant's interaction with Ms. White left his partner at the gate with no overwatch. In asking those questions, the military judge was properly clarifying uncertainties and developing the facts further. He did not cast an opinion on the credibility of any witness or express a substantive opinion on the evidence.[32] After each set of questions, the military judge allowed the parties to follow up with further examination of their own. While the military judge's questions clarified ambiguities in the Government's evidence, this case is a far cry from those where appellate courts have found that the military judge "fell off the judicial tightrope."[33] We find that a reasonable observer of Appellant's trial would have no doubt as to the trial's legality, fairness, or impartiality based on the military judge's occasional questioning of witnesses in a case where he was the fact-finder. We thus find no error, plain or otherwise.

## B. The Evidence is Both Legally and Factually Sufficient to Support Appellant's Conviction for Indecent Viewing

Appellant asserts that the evidence presented at trial was factually insufficient to prove he committed the offense of indecent viewing. His argument hinges on a claim that he did not view Ms. White's breast "under circumstances in which the other person had a reasonable expectation of privacy."[34] Appellant argues that in the circumstances of this case, a reasonable person

---

[31] *See Foster*, 64 M.J. at 336 ("[m]ilitary judges should take care to elicit information in a neutral manner and to avoid the kind of approach . . . that so closely resembles the tenor of cross-examination.").

[32] *See United States v. Jolly*, No. 200100417, 2004 CCA LEXIS 123, *8-9 (N-M. Ct. Crim. App. May 19, 2004) (unpub. op.) (finding the military judge remained impartial where he did not intrude on the members' fact-finding function, did not question the appellant's credibility, did not express opinions of the evidence, and gave appropriate instructions).

[33] *United States v. Kish*, No. 201100404, 2014 CCA LEXIS 358, *13 (N-M. Ct. Crim. App. June 17, 2014) (unpub. op.) (finding the military judge assumed role of prosecutor when he interrupted trial counsel's examination of a witness and asked a total of 234 questions).

[34] UCMJ art. 120c.

would have expected that her breasts would be observable in her vehicle, and therefore the Government's proof of the reasonable expectation of privacy element is insufficient to sustain a conviction under Article 120c. We are convinced that the victim had a reasonable expectation of privacy under the circumstances and that the evidence was sufficient for a reasonable fact-finder to have found the same. Accordingly, we find his conviction for indecent viewing both legally and factually sufficient.[35]

### 1. Legal standards governing legal and factual sufficiency

Article 66, UCMJ, requires us to conduct a de novo review and "affirm only such findings of guilty" as we find are "correct in law and fact."[36] The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt."[37] When considering legal sufficiency, we are "bound to draw every reasonable inference from the evidence of record in favor of the prosecution."[38]

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we] are . . . convinced of the [appellant']s guilt beyond a reasonable doubt."[39] We are required to take "a fresh, impartial look at the evidence," and we need not give "deference to the decision of the trial court . . . beyond the admonition in Article 66, UCMJ, to take into account the fact that the trial court saw and heard the witnesses."[40]

---

[35] We note that Appellant characterizes this AOE as a challenge only to the *factual* sufficiency of his conviction. However, his underlying argument appears more geared toward the *legal* sufficiency of Appellant's conviction. The Government's responded by addressing the conviction under the standards for both factual and legal sufficiency. Of course, we are required to evaluate Appellant's convictions for both. UCMJ art. 66(d)(1).

[36] UCMJ art. 66.

[37] *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

[38] *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

[39] *Turner*, 25 M.J. at 325.

[40] *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

Reasonable doubt "is not intended [to be] a fanciful or ingenious doubt or conjecture, but an honest, conscientious doubt suggested by the material evidence or lack of it in this case. . . . The proof must be such as to exclude not every hypothesis or possibility of innocence, but every fair and rational hypothesis except that of guilt."[41]

For Appellant to be convicted of indecent viewing under Article 120c, the Government must prove beyond a reasonable doubt the following elements: (1) that Appellant knowingly and wrongfully viewed Ms. White's "private area"; (2) that he did so without Ms. White's "consent"; and (3) that said viewing took place under "circumstances in which Ms. White had a reasonable expectation of privacy."[42] The statute defines "private area" as the "naked or underwear-clad genitalia, anus, buttocks, or female areola or nipple."[43] "Consent" means a "freely given agreement to the conduct at issue by a competent person."[44] A "lack of consent may be inferred based on the circumstances of the offense."[45] "All the surrounding circumstances are to be considered in determining whether a person gave consent."[46] Finally, the statute defines "reasonable expectation of privacy" as "circumstances in which a reasonable person would believe that she could disrobe in privacy, without being concerned that an image was being captured; or circumstances in which a reasonable person would believe that a private area of the person would not be visible to the public."[47]

*2. Appellant knowingly and wrongfully viewed Ms. White's private area without her consent*

The evidence supporting the first two elements of Appellant's indecent viewing of Ms. White's private area is uncontroverted and straightforward. Appellant's obvious intent in his interaction with Ms. White was to view her private area. In his capacity as an armed gate sentry, he ordered Ms. White to park her vehicle in a dark parking lot that was secluded from view by other

---

[41] *See United States v. Loving*, 41 M.J. 213, 281 (C.A.A.F. 1994).

[42] UCMJ art. 120c.

[43] UCMJ art. 120c(d)(2).

[44] UCMJ art. 120(g)(8).

[45] *Id.*

[46] *Id.*

[47] UCMJ art. 120c(d)(3).

vehicles and by the San Onofre gate guard house.[48] Appellant then explained to Ms. White that the minor vehicle infraction for which she was stopped could result in a $1,000 fine, while testimony at trial made clear that the infraction was at worst a "fix-it ticket"[49] and that Appellant had no authority to issue a $1,000 fine for such a minor violation. Appellant admitted to SA Juliet that he explained this ostensible fine to Ms. White in order to "scare her" and that this was why he believed Ms. White ultimately exposed herself.[50] Unaware that a broken license plate light is not a $1,000 violation, which she could not afford, Ms. White felt she was in a no-win situation in which she was compelled to expose her breasts to Appellant, as he had requested, as a last recourse. Taking these facts and circumstances into consideration, the Court finds that Ms. White did not freely consent to Appellant's request that she expose herself and that Appellant's viewing her breasts was both knowing and wrongful.

*3. Appellant's actions took place under circumstances in which Ms. White had a reasonable expectation of privacy*

The thrust of Appellant's argument on the third element is that Ms. White did not have a reasonable expectation of privacy at the time of her exposure to Appellant because she "*knowingly* expose[d] her private areas to view."[51] According to Appellant, "when a person lifts up their shirt in order to allow someone to view their breasts, they cannot possibly expect their breasts to not be viewed by another person."[52] The Government counters that "a victim has a reasonable expectation of privacy in a secluded, parked car" and that Appellant cannot "vitiate" Ms. White's reasonable expectation of privacy by causing her to expose herself to him.[53]

Our interpretation of reasonable expectation of privacy "begins with a look at the plain language" of the statutory definition.[54] The plain language used by Congress "will control, unless use of the plain language would lead to

---

[48] R. at 38.

[49] R. at 91.

[50] Pros. Ex. 5.

[51] App. Br. at 8 (emphasis added).

[52] *Id.*

[53] Gov't Br. at 14.

[54] *See United States v. Lewis*, 65 M.J. 85, 88 (C.A.A.F. 2007) (citation omitted).

an absurd result."[55] Article 120c provides two contexts in which a reasonable expectation of privacy exists:

> (A) circumstances in which a reasonable person would believe that he or she could disrobe in privacy, without being concerned that an image of a private area of the person was being captured; or

> (B) circumstances in which a reasonable person would believe that a private area of the person would not be visible to the public.[56]

It is the latter circumstance that applies in this case, the plain language of which is susceptible to a broad reading. The definition is not tethered to a particular location, or time, but only to whatever "circumstances" would lead reasonable people to believe that their private areas would not be visible to the public.

In *United States v. Lee*,[57] the Air Force Court of Criminal Appeals [AFCCA] examined this statutory definition, and we find our sister court's analysis instructive. In *Lee*, the appellant attended a large house party at a civilian residence. The victim left the party with another guest, and walked to a car about 50 feet away from the house to engage in sexual intercourse in the backseat. The other guest left the car after the liaison, and the victim remained nude in the backseat in an incoherent or unconscious state. The appellant saw the victim in this incapacitated state, and recorded her with his cell phone while she lay nude in the backseat of the car with her feet hanging outside the vehicle. While making the recording, the appellant separated the victim's legs with his hand to expose and record her genitalia.

On appeal, the appellant argued that the evidence was both legally and factually insufficient to sustain his convictions for making (and later distributing) the recording because the victim did not have a reasonable expectation of privacy. He claimed that two reasons supported his argument: (1) "[the victim] had no possessory interest in the car in which she was recorded," and (2) "she was voluntarily naked in the back seat of a parked car

---

[55] *Id.*

[56] UCMJ art. 120c(d)(3)(A)(B).

[57] No. ACM 38888, 2017 CCA LEXIS 185 (A.F. Ct. Crim. App. Mar. 14, 2017) (unpub. op.).

in what he assert[ed] was a public area."[58] The Government argued that under the circumstances of the case, the parked car was not sufficiently "public" enough to extinguish the victim's expectation of privacy. It further argued that even if she had no expectation of privacy in the vehicle, "she retained an expectation of privacy with respect to portions of her genitalia that were not visible as she lay on the seat [and the a]ppellant's separation of her legs was therefore sufficient to violate her reasonable expectation of privacy with respect to what [the a]ppellant could not have seen without physically manipulating her body."[59]

In regard to the appellant's first claim, AFCCA declined to apply Fourth Amendment standards regarding reasonable expectation of privacy as opposed to the definition found in Article 120c. Thus, it found the victim's lack of a possessory interest in the vehicle could not be dispositive. The court noted that "the statutory language is clear and defines [reasonable expectation of privacy] as it applies to this statute."[60] AFCCA similarly rejected the appellant's claim that the victim did not have a reasonable expectation of privacy due to being voluntarily naked in a vehicle parked in a public area. The court emphasized the victim's intention for bringing herself to the vehicle in which she was found, where she reasonably expected she could disrobe free from the eyes of onlookers. The court further reasoned that although other partygoers later found and observed the victim, this evidence alone did not preclude a finding that the victim reasonably thought she would be free from prying eyes.[61] In regard to the appellant's second claim, AFCCA concluded that when viewing the evidence in the light most favorable to the prosecution, the victim had a reasonable expectation of privacy (as defined by Article 120c) generally, or at a minimum, with respect to that which the appellant could only view by *manipulating her body without her consent.*[62] The court concluded that either theory was legally sufficient to support the appellant's conviction.[63]

---

[58] *Id.* at 14.

[59] *Id.* at 14-15.

[60] *Id.* at 16.

[61] *Id.* at 16-17.

[62] *Id.* at 17

[63] *Id.*

We find the logic in *Lee* to be both sound and applicable here. Appellant's argument concludes with the broad assertion that "Article 120c is not applicable in the circumstance of a person who knowingly exposes her private areas to view."[64] We decline to adopt such an interpretation of the statute, as it is overly narrow as to the "*circumstances* in which a reasonable person would believe that a private area of the person would not be visible to the public."[65] It cannot be said that Ms. White's reasonable expectation of privacy was vitiated the moment that she exposed her breasts to Appellant simply because she knew he would see her private area. In other words, the focus is not on the exposure itself but on the totality of the "circumstances" surrounding it. Here, Appellant intentionally created a situation that a reasonable person would never expect—one in which a person's private areas would be subjected to coerced exposure during an on-base traffic stop by uniformed military personnel. Such wrongful action does not undermine the reasonableness of Ms. White's expectation of privacy in the surrounding circumstances.

Two fact patterns to which Article 120c have been applied support this view. Take for instance the perpetrator who enters a bathroom and pulls back the shower curtain to reveal a nude individual. Surely that individual, in that moment, "knows" that his or her private area has suddenly been exposed, but it would be absurd to suggest that the individual's expectation of privacy has now become unreasonable because of this knowledge.[66] One might also consider the fact pattern in *Lee*, where the court found the victim at a minimum "retained an expectation of privacy with respect to portions of her [private areas] that were not visible" absent a wrongdoer's manipulation of her body. There, the perpetrator spread the victim's legs to expose her genitalia. Just as a perpetrator's action in pulling back a shower curtain on an unsuspecting victim or spreading an unconscious victim's legs do not alter those victims' reasonable expectation of privacy, nor does Appellant's wrongful manipulation of Ms. White into removing her blouse and bra to expose her breasts. Appellant's actions did not change the circumstances

---

[64] App. Br. at 8

[65] *Id.* (emphasis added).

[66] *See, e.g., United States v. Lewis*, No. 201900048, 2020 CCA LEXIS 269, at *18-19 (N-M Ct. Crim. App. Aug. 17, 2020) (unpub. op.) (where victim neither invited wrongdoer to enter his private bathroom, nor to pull back a shower curtain to reveal victim's private areas, evidence was factually sufficient to find victim enjoyed a reasonable expectation of privacy when viewed by wrongdoer).

under which his misconduct was done: an unsuspecting military spouse seeking entry through a military gate on the way to her on-base military housing. No reasonable person would believe that her private area would be visible to the public during the course of that drive.

To the extent the Government suggests Ms. White's reasonable expectation of privacy may derive purely from the location of her vehicle, this too oversimplifies the statutory definition. While in *Lee* the victim's expectation of privacy stemmed in *part* from the location of the car in which she disrobed, it was more tethered to the fact that the victim took herself *voluntarily* to that location in order to privatize her activity with her paramour from the eyes of the other partygoers in the house. Thus, her reasonable expectation was that her private areas would be visible only to her paramour, not to anyone else (including the appellant, who then took the further step of physically exposing other private areas when he found her incapacitated). In this case, Ms. White was lured to a dark, secluded area at the behest of an armed sentry as she was trying to return to her home by properly entering the gate he was guarding. Neither the record nor logic supports that Ms. White took herself to that secluded parking spot with any reasonable expectation that her private area was going to be visible to anyone at all (including Appellant, whose coercion is what caused her private area to be exposed even—and only—to him).

The statutory language requires that we look broadly at whether the "circumstances" are such that a reasonable person would expect that his or her private area would not be visible to the public. As we have detailed above, those circumstances exist here. Considering the evidence in a light most favorable to the Prosecution, we conclude that a reasonable fact-finder could have found all elements of Article 120c beyond a reasonable doubt. The evidence is thus legally sufficient to support Appellant's conviction. Regarding factual sufficiency, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt.

## III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we have determined that the findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights

occurred. UCMJ arts. 59, 66.[67] However, we agree with both Appellant and the Government that the Results of Trial do not accurately reflect that Appellant's conviction for indecent viewing under Article 120c should be characterized as "other sexual misconduct" as opposed to "sexual assault."[68] Although we find no prejudice from this error, Appellant is entitled to have court-martial records that correctly reflect the content of his proceeding.[69] Accordingly, we order correction of records in this case to accurately reflect that Appellant's conviction for indecent viewing under Article 120c, UCMJ, is not a conviction for sexual assault.

The findings and sentence are **AFFIRMED**.

Chief Judge Emeritus CRISFIELD and Senior Judge GASTON concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court

---

[67] UCMJ art. 59, 66.

[68] *MCM* (2016 ed.), Part IV, 45c.a.(d)(6).

[69] *United States v. Crumpley*, 49 M.J. 538, 539 (N-M. Ct. Crim. App. 1998).